RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0098p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JAMES KNIGHT; JASON MAYES,

        *Plaintiffs-Appellants*,

    *v.*

METROPOLITAN GOVERNMENT OF NASHVILLE &
DAVIDSON COUNTY, TENNESSEE,

        *Defendant-Appellee*.

⎫
⎪
⎬  No. 21-6179
⎪
⎭

─────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:20-cv-00922—Aleta Arthur Trauger, District Judge.

Argued: July 21, 2022

Decided and Filed: May 10, 2023

Before: BATCHELDER, WHITE, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Braden H. Boucek, SOUTHEASTERN LEGAL FOUNDATION, Roswell, Georgia, for Appellants. John W. Ayers, METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Braden H. Boucek, Kimberly S. Hermann, Celia Howard O'Leary, SOUTHEASTERN LEGAL FOUNDATION, Roswell, Georgia, Meggan S. DeWitt, BEACON CENTER OF TENNESSEE, Nashville, Tennessee, for Appellants. John W. Ayers, Allison L. Bussell, METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Nashville, Tennessee, for Appellee. Chance Weldon, TEXAS PUBLIC POLICY FOUNDATION, Austin, Texas, George A. Dean, TUNE ENTREKIN & WHITE, PC, Nashville, Tennessee, Jay R. Carson, WEGMAN HESSLER, Cleveland, Ohio, Daniel T. Woislaw, PACIFIC LEGAL FOUNDATION, Arlington, Virginia, Richard N. Coglianese, CITY OF COLUMBUS, Columbus, Ohio, for Amici Curiae.

     MURPHY, J., delivered the opinion of the court in which BATCHELDER, J., joined in full. WHITE, J. (pg. 29), concurred in the majority's application of the *Nollan*/*Dolan* test and in its remand for the reasons stated.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.   The Metropolitan Government of Nashville and Davidson County ("Nashville") passed a "sidewalk ordinance" that imposes sidewalk-related conditions on landowners who seek building permits.   To obtain a permit, owners must grant an easement across their land and agree to build a sidewalk on the easement or pay an "in-lieu" fee that Nashville will use to build sidewalks elsewhere.   This ordinance implicates a question about the Fifth Amendment's Takings Clause that has divided state courts.   *See Cal. Bldg. Indus. Ass'n v. City of San Jose*, 136 S. Ct. 928, 928 (2016) (Thomas, J., concurring in the denial of certiorari).

In particular, the parties here disagree over the "test" that we should use to judge whether the sidewalk ordinance commits a taking.   The landowner plaintiffs ask us to apply the "unconstitutional-conditions" test that the Supreme Court adopted to assess conditions on building permits in *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987).   Nashville responds that the Court has applied *Nollan*'s test only to ad hoc administrative conditions that zoning officials impose on specific permit applicants—not generally applicable legislative conditions that city councils impose on all permit applicants.   For legislative conditions, Nashville says, we should turn to the deferential "balancing" test that the Court adopted to assess zoning restrictions in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

We side with the landowner plaintiffs.   Nothing in the relevant constitutional text, history, or precedent supports Nashville's distinction between administrative and legislative conditions.   *Nollan*'s test thus should apply to both types, including those imposed by the sidewalk ordinance.   Because the district court reached a contrary conclusion, we reverse its grant of summary judgment to Nashville and remand for proceedings consistent with this opinion.

I

A

As every parent can attest, sidewalks serve many beneficial purposes.  The legislative council in Nashville, Tennessee, identified some of these purposes when passing its sidewalk ordinance.  Children and adults alike can use sidewalks as a safe transportation option for many things, ranging from the daily stroll to school or work to a strenuous exercise on a sunny day.  Ordinance, R.1-2, PageID 28.  By reducing the number of people who must drive on the streets, sidewalks also relieve traffic congestion.  *Id.*, PageID 29.  And a network of sidewalks generally increases the value of the surrounding properties, which allows homeowners to resell their homes at higher prices.  *Id.*, PageID 28.

For years, however, Nashville has not invested enough in public sidewalks, especially when considering the city's large population growth.  Forced to walk next to fast-moving cars on the city streets, Nashville's pedestrians have felt the effects of these missing walkways.  In 2018, 23 pedestrians died in the Nashville area.  *Id.*  The next year, the area's "pedestrian death index" reached 99.2—almost double the national average of 55.3.  *Id.*  To alleviate these dangers, Nashville calculated that it would need to build some 1,900 miles of new sidewalks.  *Id.*

Recognizing the need for more sidewalks is one thing.  Figuring out how to pay for them is another.  Nashville has increased its annual capital spending on sidewalks to $30 million.  *Id.*  Even with this large budget, though, the city estimates that it would take 20 years to increase its sidewalk infrastructure by just 71 miles in critical areas.  *Id.*

In 2019, Nashville's council sought to speed up this sidewalk construction by adding the sidewalk ordinance to its zoning code.  *Id.*, PageID 28–35; *see* Code of Metro. Gov't of Nashville & Davidson Cnty. ("Nashville Code") § 17.20.120 (2019).  The ordinance applies to landowners who seek to build a single- or two-family home in designated areas of the city and its surrounding county.  *See* Nashville Code § 17.20.120(A)(2).  It also applies to landowners who seek to develop or redevelop multi-family homes and nonresidential buildings in the designated areas.  *See id.* § 17.20.120(A)(1); FAQs, R.20-4, PageID 138–39.  The owners of covered

properties must comply with the sidewalk ordinance as a condition of obtaining a building permit for their proposed development. *See* Nashville Code §§ 16.28.010, 16.28.190.

The sidewalk ordinance sets different rules for different types of covered properties. It gives the owners of certain properties just one option to obtain a permit: build a sidewalk on their lots that meets the city's design standards. *Id.* § 17.20.120(C). For example, an owner has no choice but to build a sidewalk when a lot sits on the side of a street with existing sidewalks. *Id.* § 17.20.120(C)(1)(c). Likewise, an owner must build a sidewalk on a lot when it would expand the sidewalk network from an "abutting development" and the city's development plan calls for the expansion. *Id.* § 17.20.120(C)(1)(b); *see also* FAQs, R.20-4, PageID 140.

If, however, a property falls outside one of the specified categories, the ordinance gives a landowner who seeks a permit an alternative to building a sidewalk. The owner may "make a financial contribution" to a fund that Nashville will use to build sidewalks in the property's "pedestrian benefit zone[.]" *Id.* § 17.20.120(D)(1), (3). To help determine the amount of this "in lieu" fee, Nashville's public-works department must announce each July its "average" "cost" to construct a "linear foot" of sidewalk. *Id.* § 17.20.120(D)(1). For the period from July 2020 to June 2021, the department calculated this cost as $186 per linear foot. Hammond Decl., R.28, PageID 428. Nashville will then rely on this cost-per-linear-foot amount to calculate a landowner's total fee based on the size of what would have been the owner's sidewalk. But the ordinance caps the total fee at three percent of the "total construction value" of the planned development. Nashville Code § 17.20.120(D)(1).

Whether a landowner builds a sidewalk or pays an in-lieu fee, the ordinance imposes another requirement. All landowners must dedicate a "right-of-way and/or public pedestrian easement" across their property. *Id.* § 17.20.120(E). This dedication will allow the public to use the sidewalk whether it gets built immediately or at some future point. *Id.*

Nashville's zoning administrator may grant a full or partial waiver of the ordinance's requirements in various circumstances. *Id.* § 17.20.120(A)(3). Most notably, the administrator may grant a waiver if some "hardship" (such as utilities or a drainage ditch) will make it difficult for a property owner to build the sidewalk. *Id.* § 17.20.120(A)(3)(a). Separately, if a property

does not qualify for the in-lieu fee, the administrator in "unique" circumstances may grant a waiver that would allow the owner to pay this fee rather than build a sidewalk. *Id.* § 17.20.120(A)(3)(b).

If the zoning administrator denies a requested waiver, a property owner may lastly seek a variance from the Board of Zoning Appeals. *Id.* § 17.20.125. The board may grant this variance outright or require the property owner to pay the in-lieu fee or make other design changes as a condition of the board's granting the variance. *Id.*

B

In 2019, James Knight and Jason Mayes both wanted to build homes on properties covered by Nashville's sidewalk ordinance. Knight sought to construct a single-family home on a vacant lot on Acklen Park Drive:



Knight Decl., R.20-1, PageID 125–26. Because Acklen Park Drive lacks sidewalks, Knight could either build a sidewalk on his lot (which would connect to nothing) or pay the in-lieu fee. *Id.*, PageID 125. But Nashville's public-works department allegedly told Knight's construction manager that a sidewalk would cause stormwater problems and that Knight should not build one. *Id.*, PageID 127; Stevenhagan Aff., R.20-4, PageID 170–71.

Knight thus asked the zoning administrator for a waiver that would exempt him from any requirement to build a sidewalk or pay a fee. Knight Decl., R.20-1, PageID 127. The administrator denied his request. *Id.* Knight appealed this denial to the Board of Zoning Appeals. *Id.* It rejected his request for a variance and required him to pay the fee or construct a sidewalk under an alternative design that Nashville proposed. *Id.* Nashville officials later calculated Knight's total in-lieu fee for this property as $7,600. *Id.*, PageID 128. Because Knight refused to pay this amount or build the redesigned sidewalk, his permit expired. *Id.* If Nashville would exempt him from the sidewalk ordinance, he would seek another permit for the property. *Id.*

Mayes, by comparison, sought to construct a single-family home on his lot on McCall Street. Mayes Decl., R.20-2, PageID 129. The side of McCall Street on which Mayes's property sits also lacks sidewalks (but the other side has them):



*Id.*, PageID 130.

Mayes sought a waiver from the zoning administrator. *Id.*, PageID 130–31. He suggested that Nashville should not make him build "a sidewalk to nowhere." *Id.*, PageID 131.

The administrator denied Mayes's request because he could pay the in-lieu fee. *Id.* The administrator calculated this fee as $8,883.21. *Id.* Not wanting to delay construction, Mayes opted to pay the fee while he sought a variance from the Board of Zoning Appeals and a refund of the fee. *Id.* The board rejected the variance. *Id.*, PageID 132. Individual members reasoned that the Nashville council had made a policy choice to require the fee and that the board lacked discretion to waive it unless the owner identified a concrete hardship other than the cost. *Id.* Nashville ultimately used Mayes's funds to improve sidewalks located some 2.5 miles away from his property. *Id.*

The record leaves unclear whether Nashville sought an easement across Knight's lot and whether it took an easement across Mayes's lot—as the sidewalk ordinance's language requires. *See Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 572 F. Supp. 3d 428, 432 n.3 (M.D. Tenn. 2021). In the district court, Nashville suggested that the ordinance might not require an easement for landowners like Mayes who choose to pay the in-lieu fee. *See id.* Yet the district court rejected this atextual reading of the ordinance, *id.*, and Nashville disavowed reliance on the interpretation at oral argument in our court, *see* Arg. 23:50–25:44. For purposes of this case, then, we will generally assume that the ordinance requires the easement in all circumstances.

Knight and Mayes sued Nashville in federal court alleging that the sidewalk ordinance violated the Fifth Amendment's Takings Clause. They sought an injunction against Nashville's enforcement of the ordinance and the return of the in-lieu fee as restitution for the constitutional violation.

The district court granted summary judgment to Nashville. *Knight*, 572 F. Supp. 3d at 431. The parties spent much of their briefing debating the test to apply to Knight's and Mayes's takings claims. According to Nashville, the court should apply, at most, *Penn Central*'s balancing test governing land-use restrictions. According to Knight and Mayes, it should apply *Nollan*'s unconstitutional-conditions test governing conditions on building permits. The court picked *Penn Central*'s test. *See id.* at 439–43. It reasoned that the unconstitutional-conditions test applies only to "adjudicative" decisions in which zoning officials, acting on an ad hoc basis, choose the specific conditions to impose on a specific landowner's project. *See id.* at 439–42. The court viewed the sidewalk ordinance as a broadly applicable "legislative" mandate to require

all permit applicants to pay a fee or construct a sidewalk.  *See id.* at 442–43.  It next held that the ordinance "easily" met *Penn Central*'s test—a conclusion that Knight and Mayes did not even dispute.  *See id.* at 444–45.  We review the district court's decision de novo.  *See F.P. Dev., LLC v. Charter Twp. of Canton*, 16 F.4th 198, 203 (6th Cir. 2021).

II

On appeal, the parties renew their debate about the governing test for Knight's and Mayes's takings claims.  To frame this debate, we begin with two basic takings questions: When does direct government interference with private property qualify as a "taking" of the property?  And when may the government nevertheless require an uncompensated taking of an owner's property as a condition of granting the owner a discretionary "benefit" like a building permit?

A.  Direct Interference with Property

The Fifth Amendment's Takings Clause, as incorporated against the states by the Fourteenth Amendment, provides: "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V; *see Chicago, Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 241 (1897).  There are a variety of "sticks" in the "bundle" of legal rights that traditionally come with property ownership, including the right to possess the property, to use it, to exclude others from it, and to dispose of it.  *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433, 435 (1982).  Given these diverse rights, the government interferences that qualify as the "taking" of "property" can come in different forms.

Some interferences qualify as "*per se*" or automatic takings that require proper compensation whenever the government engages in them.  *See Horne v. Dep't of Agr.*, 576 U.S. 350, 358, 360 (2015).  This automatic-taking rule most obviously covers the classic appropriation in which a government seizes every stick in the bundle of rights using its eminent-domain powers.  If, for instance, a government confiscates a party's real or personal property to build a park or supply an army, it always must provide fair value for the land or goods.  *See Cedar Point*, 141 S. Ct. at 2071; *Horne*, 576 U.S. at 357–59.

Yet this automatic-taking rule extends beyond classic takings. The rule also applies when the government appropriates only some of the sticks in the bundle of property rights—most notably, the right to exclude others. *See Cedar Point*, 141 S. Ct. at 2072–73. In a long line of cases, the Supreme Court has held that the government "takes" property if it grants an "easement" that allows strangers to enter it—whether by land, air, or sea. *Nollan*, 483 U.S. at 831; *see Cedar Point*, 141 S. Ct. at 2073–74. The government thus committed a taking when it allowed union organizers to enter an employer's property for unionizing activities. *See Cedar Point*, 141 S. Ct. at 2074. It committed a taking when it allowed airplanes to fly at low altitudes over the property near its airport. *See United States v. Causby*, 328 U.S. 256, 261–65 (1946). And it committed a taking when it gave the public access to a private marina. *See Kaiser Aetna v. United States*, 444 U.S. 164, 179–80 (1979). This principle has deep roots. As Blackstone opined, the government should pay a landowner if it builds a "road" through the owner's "grounds" and allows the public to travel across it. 1 William Blackstone, *Commentaries on the Laws of England* 135 (1765).

But the automatic-taking rule has its limits. The Supreme Court has treated government interference with other "sticks" in the bundle of property rights (most notably, the right to *use* property) differently from interference with the right to *exclude* others. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323–24 (2002). A restriction on the right to use property rarely triggers the automatic-taking rule. The rule applies only if a use restriction bars a landowner from engaging in "all economically beneficial or productive use of land." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). The Court has found this criterion met only once, when a government's land-use regulations rendered beachfront properties "valueless" by barring their owner from building anything on them. *Id.* at 1020.

Most land-use regulations, by contrast, leave open some uses. Even if a use restriction bars an owner from building a factory, it might allow the owner to build an apartment complex. *Cf. Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926). The Court subjects these less severe restrictions to a case-by-case test that asks whether they go "too far" (with the courts subjectively judging how far is "too far"). *Cedar Point*, 141 S. Ct. at 2072 (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). Since *Penn Central*, the Court has balanced several

recurring factors to decide whether a use restriction goes too far.  *See id.*; *Tahoe-Sierra*, 535 U.S. at 326.  *Penn Central*'s balancing test requires courts to ask questions like: What economic impact does the regulation have on the property owner?  *See* 438 U.S. at 124.  Did the regulation come as a surprise and so interfere with the owner's "investment-backed expectations"?  *Id.*  And does the government have an adequate justification for the use restriction?  *Id.* at 124–25.

## B.  Unconstitutional Conditions

The government does not always directly interfere with constitutional rights.  It sometimes indirectly interferes with them by offering a benefit that it has no duty to provide on the condition that a party waive a right.  The government, for example, might not try to bar disfavored speech through a criminal law; it might instead dole out public funds to people only if they agree not to say the disfavored words.  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).  Under its "unconstitutional-conditions doctrine," the Supreme Court has placed limits on the government's power to extract waivers of constitutional rights in this way.  *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

But what rules divide constitutional from unconstitutional conditions on these otherwise discretionary benefits?  One generic rule is clear: If the Constitution allows the government to directly compel a private party to undertake conduct on threat of criminal punishment, the government may indirectly compel that conduct as a condition on a benefit.  *See Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59–60 (2006); *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 914–15 (6th Cir. 2019) (en banc).  The Free Speech Clause thus allowed Congress to require law schools to grant military recruiters access to their campuses as a condition of public funding because Congress could have directly compelled this access without any constitutional problem.  *See Rumsfeld*, 547 U.S. at 59–60.

For the most part, however, no general principles regulate these conditions because the Constitution contains no all-encompassing "Unconstitutional Conditions Clause."  *Hodges*, 917 F.3d at 911.  Courts instead must look to a specific constitutional right to identify the specific rules.  *Id.* at 913.  This fact brings *Nollan* to the fore.  It created a "special"

unconstitutional-conditions framework for an "exaction" in the takings context. *Koontz*, 570 U.S. at 604–05 (citation omitted).

In this context, the typical "benefit" consists of a permit that allows an owner to develop a property for a specific use (such as a residence or store). *See id.* at 601–02; *Dolan v. City of Tigard*, 512 U.S. 374, 379–80 (1994); *Nollan*, 483 U.S. at 828. Suppose that the government could directly bar the owner's requested use and deny a permit without violating the Takings Clause under *Penn Central*'s balancing test for use restrictions. *See Nollan*, 483 U.S. at 836. Suppose further that the government offers to grant this permit but only on the "condition" that the owner deed over a part of the land. *See Dolan*, 512 U.S. at 380 & n.2. If the government had directly ordered this conveyance, it would have committed a classic taking. *See id.* at 384. When may the government nevertheless require what would be an uncompensated "taking" as a condition of a permit?

The Court's answer has tried to reconcile two dueling "realities" of permitting decisions. *Koontz*, 570 U.S. at 604. On the one hand, a condition on a permit can serve important purposes by forcing an owner to internalize the costs (the "negative externalities") that a development will impose on others. *Id.* at 605; *see Cedar Point*, 141 S. Ct. at 2079. Say that a proposed retail store will increase "traffic congestion" in the area. *Koontz*, 570 U.S. at 605. The government might require the owner to give it the strip of land required "to widen a public road." *Id.*

On the other hand, the government might try to leverage its monopoly permit power to pay for unrelated public programs on the cheap. *Id.* at 604–05. If the expected value of an owner's proposed project exceeds the condition's expected costs, the owner has an incentive to give in to this "demand" even when the demand has no connection to the project's harmful social effects. *Id.* at 605. Yet this type of coercion falls near the core of the Takings Clause, which bars the government from forcing a few people to bear the full cost of public programs that "the public as a whole" should pay for. *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

In response to the push and pull of these concerns, the Court has developed a three-step unconstitutional-conditions test for permit conditions. At the "first step," a court asks whether the condition would qualify as a taking if the government had directly required it. *Koontz*,

570 U.S. at 612. If not, no takings problem exists. *Id.* If so, the government must show a "nexus" between the condition and the project's social costs; that is, the government must impose the condition because of those costs and not for other reasons. *Nollan*, 483 U.S. at 837. The government next must show a "rough proportionality" between the condition and the project; that is, the condition's burdens on the owner must approximate the project's burdens on society. *Dolan*, 512 U.S. at 391. (While this test comes from several cases, we will refer to it as *Nollan*'s test for simplicity.)

The Court's three cases on this topic demonstrate these elements. The Court created the "nexus" element in *Nollan*. There, the Nollans applied for a permit with the California Coastal Commission to replace the bungalow on their beachfront property with a larger home. 483 U.S. at 827–28. The Commission approved the permit on the condition that the Nollans grant the public an easement to travel across their beach, which sat between two nearby public beaches. *Id.* at 827–29. To justify this easement, the Commission reasoned that the larger home would harm the public by limiting its view of the ocean. *See id.* at 828. The Court held that this demand qualified as an unconstitutional condition. It noted that the Commission would have committed an automatic taking if it had compelled the Nollans to grant the easement. *Id.* at 831–32. It next assumed that the Commission could have barred the Nollans from building the home under *Penn Central*'s balancing test for use restrictions given the home's social costs, including a reduction in "the public's ability to see the beach[.]" *Id.* at 835. The Court also assumed that the Commission could have imposed hypothetical conditions (such as a height limit) to alleviate this harm. *Id.* at 836. But it held that the Commission's actual condition—an easement to walk across the beach—lacked any "nexus" to the concern with viewing the beach from afar. *Id.* at 837–39. In truth, the Commission sought to give the public a benefit unrelated to the home's costs. *Id.* at 841. But the Takings Clause required it to pay for the easement that it took to serve this purpose. *Id.* at 841–42.

The Court added the "rough proportionality" element in *Dolan*. In that case, Florence Dolan sought to double the size of her store in Tigard, Oregon. 512 U.S. at 379. As permit conditions, the city required Dolan to dedicate 10% of her land for public green space and a bike and walking path. *Id.* at 380. The city justified these conditions on the ground that the larger

store would increase traffic and stormwater runoff. *Id.* at 381–82. As in *Nollan*, the Court recognized that the city would have committed a taking if it had confiscated Dolan's property, but that the city could have barred the store expansion under *Penn Central*'s balancing test. *Id.* at 384–85 & n.6. Unlike in *Nollan*, it found a "nexus" between the development and the conditions because the latter would alleviate the traffic and stormwater problems that the former would exacerbate. *Id.* at 387–88. Yet the Court still held that the conditions were unconstitutional. *Id.* at 388–96. Apart from *Nollan*'s nexus requirement, the Court concluded, a "rough proportionality" must exist between the size of a condition and a development's social costs. *Id.* at 391. The city's conditions flunked this test. Although the city could require Dolan to keep *private* green space to protect against stormwater runoff, the Court reasoned, the city failed to explain why she had to make that space *public*. *Id.* at 392–93. And although the city could require Dolan to give some land for "public ways" to reduce traffic, the city failed to explain how the requirement for a bike and walking path matched the increased congestion that Dolan's store would cause. *Id.* at 395–96.

In *Koontz*, the Court clarified two more things. Coy Koontz owned 14.9 acres near Orlando, Florida. 570 U.S. at 599. He proposed to build on 3.7 acres of his land and to dedicate the rest to a conservation easement. *Id.* at 601. Finding his proposal inadequate, a state agency gave Koontz a choice between two alternatives: reduce the project's size to 1 acre and grant 2.7 more acres to the easement *or* proceed with the proposal and pay for improvements on the agency's land miles away. *Id.* at 601–02. The Court agreed with the Florida Supreme Court that only one of these alternatives needed to survive *Nollan*'s unconstitutional-conditions test. *Id.* at 612. But it held that the state court committed two errors when rejecting Koontz's claim. *Id.* at 604–19.

The Court first reversed the Florida Supreme Court's holding that an unconstitutional condition arises only if the state *approves* a permit with the condition that the owner give property, not if the state *denies* a permit until the owner consents to the grant. *Id.* at 606–07. Just as a speech condition on public funds could violate the Free Speech Clause even if speakers choose to speak and forgo the funds, so too a property condition on a permit could violate the Takings Clause even if owners choose to keep their property and forgo the project. *Id.* At the

same time, the denial of a permit (which rests on an attempted taking) triggers a different remedy than the grant of a permit (which commits an actual taking). An actual taking's remedy is "just compensation" but an attempted taking's remedy turns on the cause of action that an owner invokes. *Id.* at 609.

The Court next reversed the Florida Supreme Court's holding that the state agency's second alternative (that Koontz pay money) could not qualify as an unconstitutional condition. *Id.* at 611–19. The Court recognized that no unconstitutional-conditions problem arises if the government may directly compel what it makes a condition on a permit. *Id.* at 612. It also recognized that the government could directly compel ordinary taxes without a takings concern. *Id.* at 615. But the Court held that the agency's conditional demand for Koontz's money would qualify as a taking if the agency had directly imposed it outside the permitting process. *Id.* at 613–15. The Court reasoned that it would nullify the Takings Clause if it allowed a government to compel a landowner to either dedicate an easement or pay an amount "equal to the easement's value." *Id.* at 612.

## III

This summary clarifies the nature of the parties' debate: Nashville asserts that we should evaluate its sidewalk ordinance under *Penn Central*'s balancing test that governs direct restrictions on the use of property. Knight and Mayes respond that we should evaluate it under *Nollan*'s unconstitutional-conditions test that governs conditions on building permits.

## A

At first blush, Nashville's enforcement of its sidewalk ordinance looks like a clear case for *Nollan*'s unconstitutional-conditions test. As its name suggests, this test gets triggered when the government imposes "a *condition* for the grant of a building permit[.]" *Dolan*, 512 U.S. at 386 (emphasis added). And this case is about conditions on building permits. Unlike a land-use law that regulates all property owners (including those who do not seek permits), the sidewalk ordinance does not compel all owners to build a sidewalk or pay a fee. It reaches only those who seek permits. Nashville Code § 17.20.120(A)(1)–(2); *see id.* § 16.28.010. It thus applied to Knight and Mayes not because they owned lots in Nashville; it applied to them because they

sought to build family homes on those lots.  As a condition for Knight to build on Acklen Park Drive, Nashville required him to construct a sidewalk or pay $7,600.  Knight Decl., R.20-1, PageID 125–28.  And as a condition for Mayes to build on McCall Street, Nashville required him to construct a sidewalk or pay $8,883.21 for one some 2.5 miles away.  Mayes Decl., R.20-2, PageID 129–32.

Indeed, one of the ordinance's specific conditions leaves no doubt that *Nollan* applies.  As Nashville conceded on appeal, *see* Arg. 23:50–25:44, the ordinance requires all permit applicants (whether they build a sidewalk or pay a fee) to grant an easement: "Dedication of right-of-way and/or public pedestrian easement is required to permit present or future installation of a public sidewalk built to the current standards of the metropolitan government."  Nashville Code § 17.20.120(E).  Suppose Nashville required a "conveyance of [this] easement outright" rather than as a condition on a permit.  *Nollan*, 483 U.S. at 834.  That direct interference with the property owner's right to exclude would fall under the Court's automatic-taking rule, not *Penn Central*'s balancing test.  *See Cedar Point*, 141 S. Ct. at 2072.  Perhaps Nashville could require this taking as a condition on a permit (even if it could not directly compel it), but *Nollan*'s nexus and rough-proportionality elements supply the tools for deciding whether it may do so.  *See id.* at 2079.

Language in *Dolan* confirms this point.  That case noted that governments often validly impose conditions on permits that require owners to dedicate a portion of their land for public ways: "Dedications for streets, *sidewalks*, and other public ways are generally reasonable *exactions* to avoid excessive congestion from a proposed property use."  512 U.S. at 395 (emphases added).  In other words, *Dolan* suggested that these dedications would commonly *satisfy Nollan*'s test; it did not suggest, as Nashville does here, that they would *fall outside* that test.  After *Dolan*, therefore, several courts have applied *Nollan*'s test to conditions on permits requiring easements for sidewalks or other rights-of-way.  *See, e.g.*, *Skoro v. City of Portland*, 544 F. Supp. 2d 1128, 1133–38 (D. Or. 2008); *Dudek v. Umatilla County*, 69 P.3d 751, 753–59 (Or. Ct. App. 2003); *Kottschade v. City of Rochester*, 537 N.W.2d 301, 307–08 (Minn. Ct. App. 1995); *see also William J. (Jack) Jones Ins. Tr. v. City of Fort Smith*, 731 F. Supp. 912, 913–14 (W.D. Ark. 1990).

*Koontz* next shows that Nashville cannot avoid *Nollan*'s unconstitutional-conditions test for various procedural reasons. Does it matter that Knight refused to yield to the city's conditions and chose not to develop his property? No. *Koontz* holds that *Nollan* applies whenever the government gives a landowner the choice between the owner's right to just compensation and a building permit. 570 U.S. at 606–08. Nashville thus cannot evade *Nollan* simply because Knight did not succumb to the city's "coercive pressure" to waive his constitutional right. *Id.* at 607.

Does it matter that the sidewalk ordinance allowed Knight and Mayes to pay fees rather than build sidewalks? No again. Because these "commonplace" in-lieu fees resemble "other types of land use exactions," *Koontz* held that they trigger *Nollan*'s test all the same. *Id.* at 612. There was nothing special about the requested fee in *Koontz* that drove the Court to apply that test.

Does it matter that the record leaves unclear whether Nashville required Knight and Mayes to grant an easement across their properties if they chose the option to pay the in-lieu fees? *See Knight*, 572 F. Supp. 3d at 432 n.3. No, for a third time. Coy Koontz likewise did not have to grant the agency-demanded easement on the extra 2.7 acres of his land if he instead chose to pay the money. *Koontz*, 570 U.S. at 602. In other words, the Court still applied *Nollan* even though one of the options did not require an easement (beyond what Koontz voluntarily proposed). *See id.* at 611–19. *Koontz*'s logic covers this case: Even assuming that Nashville did not require an easement if Knight and Mayes chose to pay the in-lieu fees, *Nollan* applies because the city undoubtedly would have required this easement if these landowners had built sidewalks.

One final point. Assume that Nashville *already* held an easement on Knight's and Mayes's properties and had required them only to build sidewalks across its existing easement as a permit condition. Under *Nollan*'s first step, we would have to consider whether Nashville could directly compel all landowners to pay to build sidewalks on their properties. *See Koontz*, 570 U.S. at 612; *cf.* Tenn. Code. Ann. § 6-19-101(16)–(17); Henry E. Mills & Augustus L. Abbott, *Mills on the Law of Eminent Domain* § 216, at 416–17 & n.8 (2d ed. 1888) (citing *Lewis v. City of New Britain*, 52 Conn. 568 (1885)). Would this command to pay for improvements fall

under *Penn Central*'s balancing test?  Or something else?  If the former, *Nollan*'s test may well collapse into *Penn Central*'s whenever a permit condition is *itself* a use restriction.  Yet we can leave these questions unanswered in this case.  It involves the kind of permit condition (the dedication of an easement) that triggers the automatic-taking rule (not *Penn Central*'s rule) when directly imposed.

B

As its main response, Nashville says that *Nollan*'s unconstitutional-conditions test does not apply to the sidewalk ordinance because of who imposed its conditions.  The city agrees that *Nollan* might have applied if *zoning administrators*, acting on a discretionary basis, had required Knight and Mayes to build sidewalks or pay fees as an "administrative" condition for their specific permits.  But *Nashville's council* passed the ordinance as a "legislative" condition for all permits.  This legislative source, according to Nashville, should lead us to apply *Penn Central*'s test.

Nashville's claim requires us to wade into a broad judicial debate.  *See Cal. Bldg. Indus. Ass'n*, 136 S. Ct. at 928 (Thomas, J., concurring in the denial of certiorari).  Adopting Nashville's legislative-vs.-administrative divide, many state courts have refused to apply *Nollan* to legislatively compelled permit conditions.  *See St. Clair Cnty. Home Builders Ass'n v. City of Pell City*, 61 So. 3d 992, 1007–08 (Ala. 2010) (per curiam); *City of Olympia v. Drebick*, 126 P.3d 802, 807–09 (Wash. 2006); *San Remo Hotel L.P. v. City & Cnty. of San Francisco*, 41 P.3d 87, 101–06 (Cal. 2002); *Am. Furniture Warehouse Co. v. Town of Gilbert*, 425 P.3d 1099, 1103–06 (Ariz. Ct. App. 2018).  Yet many other state courts have rejected this distinction and applied *Nollan* to all permit conditions.  *See Anderson Creek Partners, L.P. v. County of Harnett*, 876 S.E.2d 476, 496–503 (N.C. 2022); *Town of Flower Mound v. Stafford Ests. Ltd. P'ship*, 135 S.W.3d 620, 640–42 (Tex. 2004); *Home Builders Ass'n of Dayton & the Miami Valley v. Beavercreek*, 729 N.E.2d 349, 356 (Ohio 2000); *Curtis v. Town of S. Thomaston*, 708 A.2d 657, 658–60 (Me. 1998); *N. Ill. Home Builders Ass'n, Inc. v. County of Du Page*, 649 N.E.2d 384, 388–90 (Ill. 1995).

Few federal circuit courts have entered this debate, perhaps because the Supreme Court only recently overruled its precedent requiring takings claimants to exhaust their claims in state court. *See Knick v. Township of Scott*, 139 S. Ct. 2162, 2167–68 (2019); *compare Heritage at Pompano Hous. Partners, L.P. v. City of Pompano Beach*, 2021 WL 8875658, at *6 (S.D. Fla. Dec. 15, 2021), *with Better Hous. for Long Beach v. Newsom*, 452 F. Supp. 3d 921, 932–33 (C.D. Cal. 2020). The Ninth Circuit at one time adopted Nashville's legislative-vs.-administrative divide, but it has since suggested that the Supreme Court's recent cases repudiate it. *See Ballinger v. City of Oakland*, 24 F. 4th 1287, 1298–99 (9th Cir. 2022); *cf. Pietsch v. Ward County*, 991 F.3d 907, 909–10 (8th Cir. 2021). For our part, we have once applied *Nollan* to an ordinance imposing conditions on landowners who sought permits to cut down trees. *See F.P. Dev.*, 16 F.4th at 205–06. Yet the parties there agreed that *Nollan* supplied the governing rules, so we did not need to address the "interesting question" whether it should cover legislative permit conditions. *Id.* at 206.

This case requires us to answer that question. We now hold that *Nollan*'s unconstitutional-conditions test applies just as much to legislatively compelled permit conditions as it does to administratively imposed ones. Nothing in the text or original understanding of the Takings Clause justifies Nashville's requested distinction. Its requested distinction also conflicts both with the Supreme Court's unconstitutional-conditions precedent and with its takings precedent.

1. *Text and History*. The Takings Clause, as noted, provides: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. This clause focuses on (and prohibits) a certain "act": the taking of private property without just compensation. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 713–14 (2010) (plurality opinion). The clause's passive-voice construction does not make significant *who* commits the "act"; it makes significant *what* type of act is committed. *Id.* Just as the text bars the executive branch from appropriating someone's land without compensation, so too it bars the legislative branch from passing a law ordering that appropriation. And because the text treats these branches the same for a "classic" taking, why should it treat them differently for a permit condition?

That said, the Supreme Court originally read the Takings Clause not to cover the states (like Tennessee) or their municipalities (like Nashville).  *See Barron v. City of Baltimore*, 32 U.S. 243, 247–51 (1833).  *Barron* held that the clause did not apply "to the legislation of the states" and that it restricted only the federal government (without distinguishing among its branches).  *Id.* at 250–51.  In this case, then, perhaps we should look to the Fourteenth Amendment, which incorporated the Takings Clause against the states.  *See Chicago, B. & Q. R.R.*, 166 U.S. at 241.  It provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1.  This text likewise contains a subject ("State") that covers all of a sovereign's branches without distinguishing among them.  *See Brinkerhoff-Faris Tr. & Sav. Co. v. Hill*, 281 U.S. 673, 680 (1930).  In short, the relevant constitutional provisions on their face offer no plausible path for Nashville's request that we adopt different takings rules for conditions imposed by different branches of government.

Without obvious textual support, Nashville perhaps could justify its proposed distinction if it grounded the distinction in some background takings principle.  But Nashville identifies nothing in the "historical record" that would allow us to establish one set of more demanding takings rules for conditions imposed at the discretion of administrators and another set of less demanding rules for identical conditions compelled by legislators.  *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 n.6 (2022).  If anything, the framers designed the Takings Clause precisely to protect against legislative action—a historical fact that undercuts Nashville's claim that we should review legislative conditions with a more deferential eye.  *See Stop the Beach*, 560 U.S. at 739 (Kennedy, J., concurring in the judgment).

Before the Fifth Amendment's enactment in the United States, for example, only legislatively backed takings could take place in England because only Parliament could authorize them.  *See* William Baude, *Rethinking the Federal Eminent Domain Power*, 122 Yale L.J. 1738, 1756 (2013); Matthew P. Harrington, *"Public Use" and the Original Understanding of the So-Called "Takings" Clause*, 53 Hastings L.J. 1245, 1263 (2002).  As Blackstone opined, the taking of property was too "dangerous" an activity to be left to just "any public tribunal," and

so "nothing but the legislature [could] perform" this activity.   1 Blackstone, *supra*, at 135. On this side of the Atlantic, it was likewise the colonial legislatures (not the other branches) that typically passed provisions authorizing the taking of property for projects like public buildings or public roads.   *See* James W. Ely, Jr., *"That Due Satisfaction May Be Made:" the Fifth Amendment and the Origins of the Compensation Principle*, 36 Am. J. Legal Hist. 1, 5–11 (1992) (listing examples).

Given this history, many sources identified the Takings Clause as a limit on legislative power in between the passage of the Fifth and Fourteenth Amendments.   As Joseph Story noted when discussing the clause, "how vain it would be to speak of such an administration, when all property is subject to the will or caprice of the legislature, and the rulers."   3 Joseph Story, *Commentaries on the Constitution of the United States* § 1784, at 661 (1833).   Or, as James Kent explained, the takings clauses in the federal and state constitutions "imposed a great and valuable check upon the exercise of legislative power[.]"   2 James Kent, *Commentaries on American Law* 276 (1827).   Many others expressed similar views.   *See, e.g.*, E. Fitch Smith, *Commentaries on Statute and Constitutional Law and Statutory and Constitutional Construction* §§ 311–13, at 466–67 (1848); William Rawle, *A View of the Constitution of the United States of America* 133 (1829); *VanHorne's Lessee v. Dorrance*, 2 U.S. 304, 310–16 (C.C.D. Pa. 1795).   Near the enactment of the Fourteenth Amendment, then, treatises listing the actions that counted as "takings" gave no hint that the discretionary act of an executive officer might amount to a taking even if the identical act would not qualify as one when legislatively compelled.   *See, e.g.*, Mills & Abbott, *supra*, §§ 30–36a, at 119–28; Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 525–30, 541–57 (1868).

In response, Nashville cites many sources noting that the Fifth Amendment, as originally understood, reached only "physical" takings invading an owner's land, not "regulatory" takings barring the owner from using the land in desired ways.   Appellee's Br. 11–17; *see Lucas*, 505 U.S. at 1014, 1028 n.15; *Murr v. Wisconsin*, 137 S. Ct. 1933, 1957 (2017) (Thomas, J., dissenting); *see generally* Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment*

*May*, 45 San Diego L. Rev. 729 (2008); John F. Hart, *Colonial Land Use Law and Its Significance for Modern Takings Doctrine*, 109 Harv. L. Rev. 1252 (1996); William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782 (1995).

We see two problems with Nashville's reliance on this originalist argument. As an initial matter, Nashville does not explain how its sources support its distinct claim that the Fifth Amendment's protections should change depending on the government actor that engages in the challenged act. These authorities do not assert that a restriction on an owner's use of property historically might have qualified as a taking if imposed as a matter of executive discretion but not if imposed through a legislative command. They assert that, no matter the source, a use restriction did not qualify as a taking under the Fifth Amendment, thereby reinforcing the importance of the "government action" rather than the government actor. Rappaport, *supra*, at 732, 735–36; *see Lucas*, 505 U.S. at 1014. The authorities thus cannot justify Nashville's request that we adopt a seemingly non-originalist distinction between legislatively compelled actions and discretionary executive actions.

Besides, unlike a typical "regulatory" taking, Nashville's sidewalk ordinance does not just restrict the use of property. It also compels landowners to grant an easement across their properties that limits their ability to exclude others. *See* Nashville Code § 17.20.120(E). The Supreme Court has consistently treated this type of compelled conveyance as falling on the physical—not the regulatory—side of the takings line. *See Cedar Point*, 141 S. Ct. at 2072–74; *Nollan*, 483 U.S. at 831–32. And Nashville makes no claim that this caselaw treating an easement as an automatic "taking" conflicts with the original understanding. Indeed, as a historical matter, the government commonly took only a "perpetual easement" on (not actual title to) the lands that it allowed the public to use for "common highways[.]" Cooley, *supra*, at 558; Mills & Abbott, *supra*, §§ 49, 276–77, at 154, 468; *cf. Woodruff v. Neal*, 28 Conn. 165, 167–68 (1859).

To be fair, the sidewalk ordinance does not take this easement outright and instead makes it a condition on a permit. So the correct originalist question here is not, as Nashville says, whether the Takings Clause allowed the government to impose a use restriction. It is whether

the clause allowed the government to commit what would otherwise be a taking by compelling a landowner to consent to it as a condition on a permit.  Nashville offers little input on the originalist answer to this separate question, merely citing scholars who have described the Supreme Court's unconstitutional-conditions caselaw as a "'doctrinal swamp' that is in 'disarray.'"  Appellee's Br. 30–31 (citations omitted).  If Nashville seeks to jettison the unconstitutional-conditions doctrine exclusively in the takings context (and nowhere else), its argument resembles the "halfway originalism" that the Supreme Court has refused to endorse. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2470 (2018).  In any event, Nashville raises this complaint to the wrong body.  As a "middle management" court, we must follow the Supreme Court's precedent whether or not we think it in disarray. *F.P. Dev.*, 16 F.4th at 205.  And once we accept *Nollan* and the cases applying it (as we must), there is no basis in the Constitution's text or history to distinguish legislatively compelled conditions from discretionary executive ones.

2. *Supreme Court Precedent*.  Apart from text and history, Nashville's argument that the Takings Clause distinguishes these two types of conditions does not fit with the Supreme Court's precedent.  As a general matter, the Court's unconstitutional-conditions caselaw has never drawn this divide.  Over some 160 years, the Court has accepted many unconstitutional-condition claims for many constitutional provisions. *See* Richard A. Epstein, *Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 Harv. L. Rev. 4, 26–102 (1988); Robert L. Hale, *Unconstitutional Conditions and Constitutional Rights*, 35 Colum. L. Rev. 321, 325–57 (1935). During that time, the Court has regularly found generally applicable legislative conditions (not just ad hoc administrative ones) unconstitutional when a legislature provided a benefit only if the recipients agreed to waive a constitutional right. *See, e.g.*, *All. for Open Soc'y Int'l*, 570 U.S. at 208, 221; *Sherbert v. Verner*, 374 U.S. 398, 403–06 (1963); *Frost & Frost Trucking Co. v. R.R. Comm'n of State of Cal.*, 271 U.S. 583, 598–99 (1926).  Indeed, the doctrine grew out of these types of generally applicable legislative conditions.  The Court held that state legislatures could not condition the ability of out-of-state corporations to do business in the state on their waiver of the right to remove lawsuits to federal court or to avoid extraterritorial taxation. *See Terral v. Burke Const. Co.*, 257 U.S. 529, 530–33 (1922); *W. Union Tel. Co. v. Kansas ex rel. Coleman*, 216 U.S. 1, 30–37 (1910); *Home Ins. Co. of N.Y. v. Morse*, 87 U.S. 445, 458 (1874).

Despite the Court's large body of precedent in this area, Nashville identifies no case in which it has treated legislative conditions differently from administrative ones. As far as we can tell, the Court typically applies the same test no matter the condition's source. Take the free-speech context. There, the Court has relied on caselaw evaluating regulatory conditions when finding legislative conditions unconstitutional. *See All. for Open Soc'y Int'l*, 570 U.S. at 216–17 (drawing on *Rust v. Sullivan*, 500 U.S. 173 (1991)). And it has relied on caselaw concerning generally applicable legislative conditions when finding ad hoc executive personnel actions unconstitutional. *See Elrod v. Burns*, 427 U.S. 347, 357–58 (1976) (plurality opinion) (drawing on *Wieman v. Updegraff*, 344 U.S. 183 (1952)). So if we accepted Nashville's proposed distinction solely for the Takings Clause, we would risk relegating the clause "to the status of a poor relation" to other constitutional guarantees. *Dolan*, 512 U.S. at 392.

To be sure, the specific unconstitutional-conditions test depends on the specific right at issue. *See Hodges*, 917 F.3d at 911. But the Court's takings caselaw has also not created legal rules that distinguish between different branches of government. The Court recently made this precise point when choosing between the automatic-taking rule (which applies to restrictions on an owner's right to exclude) and *Penn Central*'s balancing test (which applies to restrictions on an owner's right to use). *Cedar Point*, 141 S. Ct. at 2072. *Cedar Point* explained that the choice between these two rules does not depend on "whether the government action at issue comes garbed as a regulation" imposed by an administrator or a "statute" or "ordinance" imposed by a legislator. *Id.* Rather, the choice depends on the nature of the action. The automatic-taking rule applies when "the government has physically taken property for itself or someone else—by whatever means," while *Penn Central* applies when it "has instead restricted a property owner's ability to use his own property." *Id.* Our logic travels *Cedar Point*'s path.

Nashville responds with three precedent-rooted counterarguments. *First*, Nashville objects that *Cedar Point* distinguished regulatory takings from physical takings, while the city seeks to distinguish *Penn Central*'s regulatory-takings test from *Nollan*'s unconstitutional-conditions test. Appellee's Br. 31–37. It argues that the Supreme Court has drawn its proposed legislative-vs.-administrative divide when separating *Penn Central*'s domain from *Nollan*'s. For the most part, though, Nashville merely cites stray statements in the Court's decisions. In one

case, for example, the Court described *Nollan* and *Dolan* as involving "challenges to *adjudicative* land-use exactions" compelled by a specific administrator against a specific landowner. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 546 (2005) (emphasis added).

Yet other cases describe *Nollan* and *Dolan* more broadly. They drop the "adjudicative" label by describing *Nollan* as applying to "the special context of exactions," not just ad hoc administrative exactions. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702 (1999). And they describe *Nollan*'s protections as extending against "the government" without distinguishing administrators from legislators. *Koontz*, 570 U.S. at 604. Still, we do not think it worthwhile to base our decision on how best to parse the Court's competing descriptions of *Nollan* and *Dolan*. These descriptions merely reinforce its general admonition that we should not "dissect the sentences of the United States Reports as though they were the United States Code." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

*Second*, Nashville points to one way in which *Dolan* distinguished *Euclid* and *Agins v. City of Tiburon*, 447 U.S. 255 (1980), cases that upheld zoning ordinances against takings challenges. *Dolan* described these cases as evaluating "essentially legislative determinations classifying entire areas" of a city, and it contrasted those determinations with the City of Tigard's "adjudicative decision to condition [Dolan's] application for a building permit on an individual parcel." 512 U.S. at 385. According to Nashville, this statement supports its argument that only parcel-specific conditions trigger *Nollan* whereas generally applicable conditions trigger *Penn Central*.

This view treats one sentence in *Dolan* as trumping everything else in the opinion. To start, Nashville ignores the second way in which *Dolan* distinguished *Euclid* and *Agins*: Tigard had imposed "conditions" that did not just limit the "use" that Dolan could "make of her own parcel" but forced her to "deed portions of the property to the city." *Id.* In contrast, neither *Euclid* nor *Agins* involved permit conditions. The landowners in both cases had not sought permits to develop their land; they had challenged zoning restrictions on the uses to which they and everyone else in the area could put their land. *See Agins*, 447 U.S. at 257–58; *Euclid*, 272 U.S. at 379–86; *see also Monterey*, 526 U.S. at 702–03. Because the cities had not imposed any conditions on permits, the cases did not implicate the "well-settled doctrine of 'unconstitutional

conditions'" on which *Dolan* relied. 512 U.S. at 385. The landowners in *Euclid* and *Agins* instead challenged only use restrictions, so their claims fit within *Penn Central*'s balancing test for those restrictions.

The same cannot be said for this case or for *Dolan*. Unlike in *Euclid* and *Agins*, Knight and Mayes did not challenge a use restriction that applied equally to landowners who desired to build and those who did not. As in *Dolan*, they challenged a condition on a permit. And unlike in *Euclid* and *Agins*, the sidewalk ordinance did not impose a condition that limited just the uses that they could make of their land. As in *Dolan*, it required permit applicants to grant an easement. This case thus matches *Dolan*—not *Euclid* and *Agins*—in every way that matters.

Although the sidewalk ordinance's conditions extend to all permit applicants whose property falls within covered areas (not just a specific applicant), we do not read *Dolan* as making the parcel-specific nature of a condition important. *See Anderson Creek*, 876 S.E.2d at 499 n.14; *Flower Mound*, 135 S.W.3d at 640–42. Indeed, Nashville's proposed distinction between "legislative" conditions (those mandated across the board by a legislature) and "adjudicative" conditions (those imposed on an ad hoc basis by an administrator) would force courts to draw indiscernible lines. *Flower Mound*, 135 S.W.3d at 641. Most zoning schemes involve a mix of legislative and administrative choices. *See id.* So how should courts decide which conditions are "adjudicative" and which are "legislative"?

A comparison of the zoning scheme in *Dolan* with Nashville's sidewalk ordinance proves the difficulty of this task. The two schemes bear striking similarities to each other. The conditions that the City of Tigard required in *Dolan* did not spring from pure administrative fiat. They sprang from the city's general development plan that had been "codified" in its "Community Development Code." 512 U.S. at 377. As a condition on a permit, this general code required owners in designated areas (like Dolan) to dedicate "sufficient open land" for green space and a pedestrian and bicycle path. *Id.* at 379–80. Dolan thus sought a variance from the *code's* "standards," not from the *administrator's* standards. *Id.* at 380. And the administrator's primary "adjudication" concerned Dolan's "requested variance from the permit conditions otherwise required to be imposed by the Code." *Id.* at 413 n.* (Souter, J., dissenting).

This case included the same type of "adjudication." As in *Dolan*, the conditions on Knight and Mayes arose from a general ordinance. And as in *Dolan*, the zoning administrator and Board of Zoning Appeals "adjudicated" Knight's and Mayes's requests for a waiver or variance from the conditions. Perhaps Tigard's scheme introduced more discretion on the front end by allowing administrators to choose the specific amount of dedicated green space that was "sufficient." *Id.* at 379. But Nashville's scheme introduces plenty of discretion on the back end. It allows the zoning administrator to waive the ordinance's conditions for any "hardship" and the Board of Zoning Appeals to broadly grant variances. *See* Nashville Code §§ 17.20.120(A)(3)(a), 17.20.125. Because *Dolan* applied *Nollan*'s test to Tigard's half-legislative and half-adjudicative administrative scheme, that test necessarily covers Nashville's similar scheme.

*Third*, Nashville highlights *Nollan*'s statement (reiterated in *Koontz* and *Dolan*) that its unconstitutional-conditions test seeks to prevent "an out-and-out plan of extortion" in which the government offers a permit only if an applicant hands over property for unrelated purposes. *Nollan*, 483 U.S. at 837 (citation omitted); *see Koontz*, 570 U.S. at 605–08; *Dolan*, 512 U.S. at 387. According to Nashville, this extortion risk (*Nollan*'s alleged "central concern") exists more for one-off administrative conditions imposed by unelected administrators than it does for uniform legislative conditions imposed by democratically accountable actors. Appellee's Br. 18.

This claim suffers from both legal and practical problems. Legally, Nashville places the purpose of the Takings Clause above its language. Even assuming that *Nollan*'s "ultimate goal" is to prevent this kind of extortion, we must implement that goal in a way that respects the enacted text. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). And again, the text does not distinguish between legislative and administrative acts. *See Stop the Beach*, 560 U.S. at 713–14 (plurality opinion). Nobody would argue that we should allow a city council to commit an uncompensated appropriation of a majority of its residents' homes because the injured residents could "still petition their councilmembers, elect new councilmembers, or even run for office to" change the law. Appellee's Br. 22. The text bars that classic taking whether or not one would describe it as "extorting" a minority of residents. And once *Nollan* interpreted the clause's list of prohibited "act[s]" to include certain permit conditions, there is likewise no textually sound way

to treat identical conditions differently based on their source. *Stop the Beach*, 560 U.S. at 713–14.

Practically, an "extortion" risk exists no matter the branch of government responsible for the condition. *See Flower Mound*, 135 S.W.3d at 641. Nashville cites no empirical support for its claim that administrators are more likely than legislators to single out a subset of individuals (those seeking permits) and make them pay for valid programs that society "as a whole" should finance. *Armstrong*, 364 U.S. at 49. A majority of local taxpayers may well "applaud" the lower taxes that their politically sensitive legislators can achieve through this type of cost shifting. *Flower Mound*, 135 S.W.3d at 641. James Madison, after all, warned that the dangers of one "faction" gaining a majority increased as the size of the government shrank. *See The Federalist* No. 10, at 78 (James Madison) (Clinton Rossiter ed., 1961). In this case, for example, Nashville could have financed its sidewalk expansion through a generally applicable special assessment imposed on all property owners. It instead opted to rely on in-lieu fees charged only to those who sought to develop their property. Nashville thus required Mayes to pay for a sidewalk that he may well never use some 2.5 miles away from his home. Mayes Decl., R.20-2, PageID 132. But the Takings Clause (like the rest of the Bill of Rights) seeks to protect a minority from the popular will as much as from the bureaucratic one. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 639 (1943). *Nollan*'s concerns with extortion thus offer no grounds to jettison its test here.

IV

Our conclusion that *Nollan*'s unconstitutional-conditions test applies leaves two questions. *Question One*: Does Nashville's application of its sidewalk ordinance to Knight and Mayes satisfy this test? In other words, has Nashville shown a "nexus" and "rough proportionality" between the conditions that it imposed on Knight and Mayes and the social costs of their homes? *Nollan*, 483 U.S. at 837; *Dolan*, 512 U.S. at 391. The answer is not obvious. *Dolan* opined in dicta that "dedications" for "sidewalks" are often "reasonable" conditions on permits. 512 U.S. at 395. Yet *Dolan* likely had in mind conditions requiring the dedication of a sidewalk on the owner's own property as part of an existing sidewalk network in the area. Here, by contrast, Nashville required Knight and Mayes to either build useless "sidewalks to nowhere"

or pay for sidewalks miles away. These conditions do not look all that proportional to any specific harms from their homes, so the district court concluded that Nashville likely could not meet *Dolan*'s rough-proportionality element. *See Knight*, 572 F. Supp. 3d at 443–44.

In the end, though, we need not decide this question because Nashville has waived any argument that it can satisfy this unconstitutional-conditions test. Knight and Mayes spent pages of their brief arguing that the city could not meet *Nollan*'s and *Dolan*'s elements. *See* Appellants' Br. 27–35. But Nashville did not even try to respond, opting to rely exclusively on its claim that *Penn Central*'s test applied. *See* Appellees' Br. 10–43. In prior cases, we have treated this type of omission as a waiver, not just a forfeiture. *See United States v. Noble*, 762 F.3d 509, 528 (6th Cir. 2014). And when questioned at oral argument about this noticeable omission, Nashville's counsel conceded that the city abandoned any defense under *Nollan*'s test. He reasoned that the test is "an extremely difficult standard to meet, and the sidewalk ordinance likely doesn't meet that standard." Arg. 31:22–30. We thus may save this issue for a case in which Nashville seeks to satisfy *Nollan*'s test as against other permit applicants.

*Question Two*: What is the proper remedy for the violation of Knight's and Mayes's rights under the Fifth Amendment? Is Mayes entitled to the reimbursement of his in-lieu fee as "just compensation" for the condition that Nashville imposed on him? Would this relief fall under § 1983 or the state-law restitution claim that Mayes also brought? *Cf. Koontz*, 570 U.S. at 608–09. Is Knight entitled to an injunction (or at least a declaratory judgment) against the ordinance's application to him? Or is "injunctive relief" "foreclosed" because he has "available" "just compensation remedies" if he reapplies for a permit? *Knick*, 139 S. Ct. at 2179; *cf. D.M. Osborne & Co. v. Mo. Pac. Ry. Co.*, 147 U.S. 248, 258–59 (1893). Given the parties' limited briefing on the proper remedy, we will leave that issue to the district court. *See Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 501–02 (6th Cir. 2020).

We reverse and remand for the district court to determine the appropriate remedy.

———————————

**CONCURRENCE**

———————————

WHITE, Circuit Judge, concurring.  I join in the majority's conclusion that the Supreme Court would apply the *Nollan*/*Dolan* test to the provisions of Nashville's sidewalk ordinance challenged here and in its remand for the reasons stated.