RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ERIC S. SMITH,

*Petitioner*,

*v.*

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,

*Intervenor*.

No. 24-3907

───────────────

On Petition for Review
of an Order of the Securities and Exchange Commission;
No. 3-20127.

Argued: October 27, 2025

Decided and Filed: June 16, 2026

Before: READLER, MURPHY, and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Russell G. Ryan, NEW CIVIL LIBERTIES ALLIANCE, Arlington, Virginia, for Petitioner. Courtney L. Dixon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Amir C. Tayrani, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Intervenor. **ON BRIEF:** Russell G. Ryan, NEW CIVIL LIBERTIES ALLIANCE, Arlington, Virginia, Robert Knuts, GUNGNIER LAW PLLC, Greenport, New York, for Petitioner. Courtney L. Dixon, Caroline W. Tan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Rachel M. McKenzie, Daniel Staroselsky, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Washington, D.C., for Respondent. Amir C. Tayrani, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Intervenor.

READLER, J., delivered the opinion of the court in which MURPHY, J., concurred. MURPHY J. (pp. 18–24), delivered a separate concurring opinion. BLOOMEKATZ, J. (pp. 25–26), delivered a separate opinion concurring in the judgment.

———————————

**AMENDED OPINION**

———————————

READLER, Circuit Judge.  Legendary director Martin Scorsese's highest grossing film, *The Wolf of Wall Street*, features the real-life trials and tribulations of Jordan Belfort, a hard-charging New York City stockbroker.  After passing the Series 7 exam and qualifying to buy and sell securities, Belfort amasses enormous wealth as a broker, only to land in hot water with the Securities and Exchange Commission over his suspicious trading activity and other antics.  *See generally The Wolf of Wall Street*, Netflix (Paramount Pictures 2013).

For understandable cinematic reasons, the movie glosses over some of the finer points of the securities industry's regulatory structure, including who administers the Series 7 exam.  That job currently belongs to the Financial Industry Regulatory Authority, better known simply as FINRA.  Among other securities-related rules FINRA puts forth, one set of regulations requires an applicant interested in taking the Series 7 exam (or a variety of other qualifying securities industry exams) to first register with FINRA or be associated with a FINRA member firm.

Unlike Belfort, petitioner Eric Smith declined to register with the appropriate authorities.  But like Belfort, he still ended up in the SEC's crosshairs (albeit for entirely different reasons).  Smith now seeks review of the SEC's order upholding sanctions against him for violating a host of securities-related laws and administrative rules.  He argues that FINRA lacked jurisdiction over him and that the proceedings before the SEC ran afoul of Article III and the Seventh Amendment.  With respect to those latter issues, however, Smith failed to raise his constitutional arguments before the SEC, so we cannot reach them.  And as to the threshold jurisdictional question, because FINRA had statutory jurisdiction over Smith despite his refusal to register, we deny his petition for review.

I.

A.  To understand this case, it is helpful first to consider the history and structure behind FINRA as well as its relationship with the securities industry.  A security is "[a]n instrument that evidences the holder's ownership rights in a firm (e.g., a stock), . . . creditor relationship with a

firm or government (e.g., a bond), or . . . other rights (e.g., an option)." *Security*, *Black's Law Dictionary* (12th ed. 2024).  For centuries, the Anglo-American tradition has relied at least in part on markets for the sale of securities.  John I. Sanders, *Break from Tradition: Questioning the Primacy of Self-Regulation in American Securities Law*, 7 Mich. Bus. & Entrepreneurial L. Rev. 93, 93 (2017).  Initially, these exchanges were deeply individualized affairs, with brokers meeting at designated coffee shops to trade securities.  *See id.* at 93–94.  Over time, however, the number of recorded stockholders increased drastically, making personal dealings infeasible.  *See* Elisabeth Keller & Gregory A. Gehlmann, *A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934*, 49 Ohio St. L.J. 329, 331 (1988).  Those developments put investors at a distance from the entities in which they were investing, elevating the opportunities for fraud in the market stemming from information asymmetries, acts that could have devastating consequences if left unchecked.  And in some instances, regrettably, those fears became realities, from scandals in the industry to panics in the markets.  *See id.* at 336 (describing the cycle of stock market panics).  Those experiences led to reform efforts.  Beginning with New York's "Act to prevent the pernicious practice of stock jobbing, and for regulating sales at public auctions," 1792 N.Y. Laws 368, rules for who and how one can participate in the securities industry have been a core feature of American securities markets.  *See* Sanders, *supra*, at 94–95.

Many of the oversight efforts tied to the securities markets came by way of self-regulation.  The New York Stock Exchange, for instance, traces its roots back to a 1792 agreement among private individuals to set rules governing the sale of stock among private brokers.  *See id.*; *see also* A.C. Pritchard & Robert B. Thompson, *A History of Securities Law in the Supreme Court* 25–26 (2023) (detailing the NYSE's resistance to government regulation).  This practice of self-regulation among exchanges continued unimpeded at the federal level until 1933, when Congress began regulating the securities industry.  *See* Howard C. Westwood & Edward G. Howard, *Self-Government in the Securities Business*, 17 Law & Contemp. Probs. 518, 519–20 (1952) (describing historical self-regulatory practices among exchanges); Keller & Gehlmann, *supra*, at 343, 346 (describing, among other initiatives, the introduction of registration statement requirements and the imposition of civil liability for untrue statements in the course of securities sales).  Yet Congress's foray into regulating the securities markets did

not spell the end of self-regulation by the exchanges. Spurred on by then–SEC Chair William O. Douglas, Congress soon adopted a self-regulatory organization (SRO) model for the exchanges. *See* Sanders, *supra*, at 111–13; *see also* Pritchard & Thompson, *supra*, at 46 (describing Douglas's efforts). The SRO model required national securities associations to register with the SEC. 15 U.S.C. § 78o–3(a), (b); *see also* Pritchard & Thompson, *supra*, at 46 (explaining how this regulatory scheme was designed to work). Those associations, as SROs, would promulgate rules subject to SEC approval, *id.* § 78s(b), (c), and, in turn, enforce those rules alongside existing securities laws and regulations against their membership, *id.* § 78s(g). As for individuals interested in selling securities, before they could do so lawfully, they had to choose one of two options: Either join an association or associate with a member of an association. *Id.* § 78o(a)(1).

Only one national securities association has ever existed—the National Association of Securities Dealers. Formed in 1939, the Association would go on to serve as the lone self-regulatory body for nearly seven decades. In 2007, the NASD merged with the New York Stock Exchange's internal regulatory body to create FINRA. Sanders, *supra*, at 113–14.

FINRA is a private, not-for-profit member organization formed under Delaware law. *Mohlman v. FINRA*, 977 F.3d 556, 557 (6th Cir. 2020). The government plays no role in funding FINRA or choosing its leadership. Instead, FINRA promulgates rules for its members and associated persons, which the SEC reviews and modifies as it sees fit. 15 U.S.C. § 78s(b), (c). FINRA also imposes discipline through its internal adjudicatory process for violations of its rules and federal securities law, again subject to SEC oversight. *Id.* § 78o-3(b)(2), (7), (8). This power to impose disciplinary sanctions, however, is distinct from the power to enforce those sanctions in federal court if a disciplined party does not voluntarily comply; while FINRA has the first power, it lacks the second. *See Fiero v. FINRA*, 660 F.3d 569, 571 (2d Cir. 2011). Thus, to enforce its sanctions, FINRA must once again rely on the SEC, which has the statutory power to go to federal court to bring FINRA discipline to bear. *See* 15 U.S.C. § 78u(d), (e); *SEC v. Mohn*, 465 F.3d 647, 654 (6th Cir. 2006).

B. With this regulatory backdrop in mind, consider the dispute at hand. In 1998, Smith founded Consulting Services Support Corporation (CSSC). As the company's majority owner,

Smith served as its chairman and CEO. Included in CSSC's corporate structure were several wholly owned subsidiaries that operated out of the company's Michigan office, including CSSC Brokerage Services, Inc., a registered FINRA broker-dealer. (The parties refer to this subsidiary as "CSSC-BD" to signify its broker-dealer status.) Acknowledging CSSC-BD's registration, Smith nonetheless maintained to FINRA that he was exempt from registering so long as he was not actively engaged in managing CSSC-BD's securities business.

Whether that legal conclusion was true or not, its factual premise was wobbly at best. From 2010 to 2015, Smith played an increasingly hands-on role in the management of CSSC-BD. He directly managed three debt offerings during the period, instructing CSSC-BD representatives to sell bonds to customers based on offering documents he prepared. The last of these offerings contained a number of false or misleading statements about CSSC's potential revenue opportunities and current financial situation. Smith also personally solicited investors, ultimately garnering $130,000 from four of them.

A routine FINRA examination of CSSC-BD and investor complaints eventually uncovered these activities. In response, FINRA's Department of Enforcement filed a complaint against Smith alleging that he violated a host of statutory provisions as well as industry regulations, including § 10(b) of the Exchange Act, SEC Rule 10b–5, §§ 17(a)(2) and (3) of the Securities Act, FINRA Rules 2010 and 2020, and NASD Rules 1021(a) and 1031(a). Following a disciplinary proceeding, FINRA ruled against Smith on all counts. FINRA's ensuing sanctions order, however, was tied exclusively to Smith's violations of the Exchange Act and Rule 10(b)–5. As punishment, FINRA ordered Smith to pay $130,000 in restitution (either to the victims of his fraud or, if they could not be located, to FINRA) and barred him from associating with any FINRA member. The SEC affirmed FINRA's decision in an opinion that Smith now petitions this Court to review. *See Eric S. Smith*, Exchange Act Release No. 100762, 2024 WL 3875989, at *1 (Aug. 19, 2024).

II.

The SEC's findings of fact are "conclusive" on review "if supported by substantial evidence." 15 U.S.C. § 78y(a)(4). "Substantial evidence," in turn, "is that which a 'reasonable

mind' would find sufficient to support the factual finding." *Jones Bros., Inc. v. Sec'y of Lab.*, 68 F.4th 289, 295 (6th Cir. 2023) (citing *KenAmerican Res., Inc. v. U.S. Sec'y of Lab.*, 33 F.4th 884, 891 (6th Cir. 2022)). As to questions of law, including issues of statutory and constitutional interpretation, we conduct de novo review. *Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 846 (6th Cir. 2021) (citing *MISO Transmission Owners v. FERC*, 860 F.3d 837, 841 (6th Cir. 2017); *Cincinnati Gas & Elec. Co. v. FERC*, 724 F.2d 550, 554 (6th Cir. 1984)).

Smith takes a targeted approach in his petition for review. He does not contest the fact that substantial evidence supports the SEC's findings that he controlled a FINRA member firm. Nor does he quarrel with the SEC's conclusion that his conduct violated the Exchange Act, Rule 10(b)–5, and FINRA's internal rules. Instead, Smith contends that the SEC erred as a matter of law in holding that FINRA had regulatory jurisdiction over him, and, further, that the SEC could deprive him of the opportunity to contest the allegations against him before a jury in an Article III court. (Smith also initially made a private nondelegation doctrine and Appointments Clause challenge. FINRA responded, however, that it acts "subordinately" to the SEC as an "aid," which it understood to resolve these potential problems. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388, 399–400 (1940); *Oklahoma v. United States*, 163 F.4th 294, 306 (6th Cir. 2025). Smith withdrew his nondelegation and appointments challenges based on this concession, so we need not resolve them.) We thus turn to Smith's remaining challenges to the SEC's determination.

III.

Start with Smith's statutory argument. Smith, recall, never registered with FINRA. It follows, he says, that FINRA—a private, self-regulatory organization—cannot discipline him. On Smith's view, he is a member of the public being prosecuted by a non-governmental organization for violating the law, an atypical practice in our American regulatory scheme. *See Oklahoma*, 163 F.4th at 314 (acknowledging that allowing private organizations to enforce federal regulatory schemes "appears to cut against the grain"); *United States v. Ackerman*, 831 F.3d 1292, 1296 (10th Cir. 2016) (Gorsuch, J.) ("[W]hen an actor is endowed with law enforcement powers beyond those enjoyed by private citizens" the actor is typically "a governmental entity." (citation modified)).

FINRA's statutory jurisdiction, however, is not so narrowly cabined. As to the threshold question regarding FINRA's power to regulate, Congress has empowered national securities associations like FINRA to "provide that . . . its members and persons associated with its members shall be appropriately disciplined for violation" of securities laws and regulations. 15 U.S.C. § 78o–3(b)(7); *see also id.* § 78o–3(h)(1) (setting forth the requirements to discipline a "member or person associated with a member"); *id.* § 78s(g)(1)(B) (requiring registered securities associations to enforce compliance with securities law by "its members and persons associated with its members"). And as to FINRA's authority over Smith, we note that FINRA has disciplinary power over both members and "persons associated with its members." *Id.* § 78o–3(b)(7). So even if Smith never became a FINRA member, he still falls under FINRA's enforcement jurisdiction if he is associated with a member.

All of this raises the question: Was Smith associated with a FINRA member? Helpfully, Congress defined for us the phrase "person associated with a member." *See id.* § 78c(a)(21). Included within that definition is "any person directly or indirectly controlling . . . such member." *Id.* As a result, if Smith controlled a FINRA member, he falls within the association's enforcement ambit. And on that issue, the SEC found that he did exercise such control. As the SEC explained, Smith was the chairman, CEO, and majority owner of CSSC, which wholly owned CSSC-BD, a FINRA member. He personally solicited investments in CSSC and directed CSSC-BD's registered representatives to do the same. And he was responsible for the recruiting, hiring, and firing of CSSC-BD personnel, whose commissions he also personally determined. On this record, Smith's argument that FINRA lacks authority to discipline him runs counter to a straightforward reading of the relevant statutory text.

Smith does not offer a contrary reading of the statute. Instead, he takes issue with the notion of a private organization enforcing the law against one who did not consent to its jurisdiction. But whether a private organization may be afforded such governmental power is primarily a quibble with Congress, which has delineated the scope of FINRA's enforcement jurisdiction. To be sure, Congress's decision to assign this enforcement authority to a private entity theoretically might raise private nondelegation problems, as Judge Walker has previously explained. *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1343–45 (D.C. Cir. 2024) (Walker,

J., concurring in the judgment in part and dissenting in part) ("[B]ecause [FINRA] enforces federal law and rules that carry the force of law . . . without any initial approval from its supposed supervisor, the SEC[,] . . . [FINRA] transgresses the private nondelegation doctrine." (citation modified)). *But see Oklahoma*, 163 F.4th at 307 (collecting cases approving of the SEC's SRO model). For today's purposes, it is enough to note that Smith no longer presses his nondelegation challenge because he now agrees that FINRA is simply an adjunct to the SEC, a governmental entity. That leaves only his statutory argument, which is foreclosed by the statute's text.

IV.

Next up is Smith's constitutional argument. He contends he had a right under the Seventh Amendment to a jury trial before an Article III judge based on the logic of *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024), meaning he could not be sanctioned in a proceeding before the SEC without his consent to the forum. But we may not reach the merits of this argument. As Smith never raised this issue before the SEC, we are statutorily barred from resolving the issue. *See* 15 U.S.C. § 78y(c)(1).

A. We begin with a threshold skirmish between the parties over an asserted double omission of sorts on Smith's part, namely whether on appeal Smith should be faulted for not properly addressing his purported failure to exhaust his constitutional claim before the SEC. In his opening brief, Smith mentioned in a footnote that he did not raise with the SEC his constitutional challenge to the agency proceeding, and committed to addressing the exhaustion issue more fully should the SEC press the matter in its appellate brief. The SEC, in turn, did so. In its brief, the agency claimed that Smith had waived the right to defend his failure to exhaust during his administrative proceeding by foregoing a more full-throated argument in his opening brief.

As a general rule, "a party does not preserve an argument by saying in its opening brief (whether through a footnote or not) that it may raise the issue later, for example, in a reply brief." *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 331 (6th Cir. 2009) (citation modified). That said, exhaustion requirements—like 15 U.S.C. § 78y(c)(1)—are usually affirmative

defenses, meaning that if the agency does not raise the issue, a court may proceed to consider a claim regardless of whether it was raised before the agency.  *See K & R Contractors, LLC v. Keene*, 86 F.4th 135, 145 (4th Cir. 2023).  For that reason, a party is not required to anticipate affirmative defenses in its opening brief; so long as it responds to those defenses in its reply brief, it preserves its arguments on the issue.  *See Overton v. Macauley*, 822 F. App'x 341, 345 (6th Cir. 2020).  Smith did so here, so we therefore turn to the merits of his exhaustion arguments.

B.  To preserve an issue for review before the courts of appeals, a party must first exhaust it before the SEC.  That much is clear from 15 U.S.C. § 78y(c)(1), which instructs that "[n]o objection to an order or rule of the Commission, for which review is sought under this section, may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so."  As this exhaustion requirement is statutory in nature, *see Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 746 (6th Cir. 2019), we may not excuse a petitioner's failure to exhaust unless the petitioner qualifies for an exception set out by statute, *see Singh v. Rosen*, 984 F.3d 1142, 1155–56 (6th Cir. 2021) (quoting *Ross v. Blake*, 578 U.S. 632, 639 (2016)).

Smith concedes that he failed to raise his constitutional challenges before the SEC.  So he is left to explain why "there was reasonable ground for [his] failure to do so."  15 U.S.C. § 78y(c)(1).  He offers three justifications.  One, the SEC lacked the competence to adjudicate his constitutional arguments.  Two, *Jarkesy* represents an intervening change in law that excuses his forfeiture of the issue.  And three, it would have been futile to raise the issue before the SEC.

1.  Smith begins by claiming that the SEC was incompetent to adjudicate his structural constitutional argument.  The SEC's history with these sorts of claims belies that assertion.  The agency, we note, has repeatedly adjudicated the merits of Seventh Amendment challenges.  *See, e.g.*, *John Thomas Cap. Mgmt. Grp. LLC*, Securities Act Release No. 10834, Exchange Act Release No. 89775, Investment Company Act Release No. 34003, 2020 WL 5291417, at *27 (Sep. 4, 2020), *vacated on the merits*, *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022); *Charles L. Hill, Jr.*, Exchange Act Release No. 79459, 2016 WL 7032731, at *3 (Dec. 2, 2016).  The same is true for other constitutional challenges.  *See, e.g.*, *Newport Coast Sec., Inc.*, Exchange Act

Release No. 88548, 2020 WL 1659292, at *17–18 (Apr. 3, 2020) (Appointments Clause challenge); *John Thomas Cap.*, 2020 WL 5291417, at *25–28 (separation of powers, Appointments Clause, Equal Protection Clause, and Due Process Clause challenges). By all accounts, in other words, the SEC addresses constitutional arguments regarding its structure with some frequency. We see no reason it could not have tackled Smith's constitutional challenge as well.

Seeing things differently, Smith points to cases that he says suggest that the SEC is unable to adjudicate the validity of its own adjudicatory structure. *See Axon Enters., Inc. v. FTC*, 143 S. Ct. 890, 905 (2023); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 (2010). But fairly read, those decisions address a different point, namely, whether a plaintiff may go to district court before an agency's adjudication is complete. *Axon*, 143 S. Ct. at 897, 906; *Free Enter. Fund*, 561 U.S. at 489. Regardless of whether Smith had a strong argument that he could go to federal court during his FINRA and SEC proceedings to challenge the agencies' adjudicatory structures, he did not do so. And "[w]hen litigants *choose* to use a statutory review mechanism" instead of going to district court, "they must still meet [the exhaustion requirement's] strictures." *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 65 n.2 (D.C. Cir. 2023). That describes Smith's circumstances. He opted to litigate his case before the SEC without notifying the agency that he believed he was entitled to a jury trial in an Article III court. Having done so, he cannot now complain on petition from the agency's decision about the competence of those administrative tribunals.

Our decision in *Calcutt v. FDIC* does not change things. 37 F.4th 293 (6th Cir. 2022), *rev'd summarily*, 143 S. Ct. 1317 (2023) (per curiam). Even if *Calcutt*'s analysis on exhaustion remains viable following the Supreme Court's summary reversal of that decision on a different basis, it still does not help Smith. *Cf.* Bryan Garner et al., *The Law of Judicial Precedent* 123–24 (2016) (explaining that under a "strict" view of precedent an opinion's holding that affirms with respect to one issue is no longer binding if the opinion reverses with respect to another issue sufficient to resolve the case, but under a "loose" view of precedent the affirmance on the alternative issue remains binding because it reflects reasoned decisionmaking). There, we held that Calcutt had not forfeited his Appointments Clause challenge to the FDIC's board structure

because no statute required exhaustion, and because the FDIC had no power to consider Calcutt's facial constitutional challenge. *See Calcutt*, 37 F.4th at 312–13. That situation is far afield from the one presented here. All agree that § 78y(c)(1) is a statutory exhaustion requirement. And Smith's challenge is an as-applied one. Accordingly, *Calcutt* is a poor guide for today's dispute.

All told, the SEC's competency is not a fair ground for excusing Smith's failure to raise his Seventh Amendment argument.

2. Next, Smith argues that *Jarkesy* represented an intervening change in law that excused his failure to raise the issue before the SEC. As applied to this administrative setting, the doctrine invoked by Smith "generally serves to excuse a failure to exhaust when an issue was not available to the party" during an earlier administrative proceeding. *Joseph Forrester Trucking v. Dir., Off. of Workers' Comp. Programs*, 987 F.3d 581, 592 (6th Cir. 2021) (citing *Hormel v. Helvering*, 312 U.S. 552, 558–59 (1941)). According to Smith, his Seventh Amendment argument did not become viable until *Jarkesy* announced a change in Supreme Court jurisprudence, meaning the argument was not one he could have raised before the SEC.

Smith's attempt to excuse his forfeiture, however, has multiple flaws. First and foremost, *Jarkesy* does not represent an intervening change in law. There, the Supreme Court explained that its prior decision in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), controlled the outcome. *See Jarkesy*, 144 S. Ct. at 2135. Where a prior case effectively dictates a subsequent outcome, there is no intervening change in law. *See Joseph Forrester*, 987 F.3d at 592. Consider *Joseph Forrester*, for example, where we held that *Lucia v. SEC*, 585 U.S. 237 (2018), was not an intervening change in law in the Appointments Clause context because *Lucia* emphasized that "the Supreme Court [in *Freytag*] had already said 'everything necessary to decide th[at] case,'" *Joseph Forrester*, 987 F.3d at 592 (quoting *Lucia*, 585 U.S. at 247). So too in *Jarkesy*. 144 S. Ct. at 2135 ("*Granfinanciera* effectively decides this case."). In the end, *Jarkesy* was an application of the traditional Article III and Seventh Amendment analysis, not a departure from it. That leaves Smith without an intervening change in law that would excuse his failure to raise the issue before the SEC.

Even if *Jarkesy* was an intervening departure from precedent, the fact remains that the Supreme Court handed down that decision *before* the SEC decided Smith's case, yet Smith failed to bring the decision to the Commission's attention. Instructive again is *Joseph Forrester*. There, we rejected an intervening change of law excuse when the petitioners "failed to raise that development with the respective ALJs in the wake of" the alleged intervening change. *Joseph Forrester*, 987 F.3d at 592. So too here. Smith opted not to raise *Jarkesy* with the SEC even though his case was still pending before the Commission when *Jarkesy* was decided. Understood that way, *Jarkesy* is not so much an intervening change in law as it is law that Smith neglected to bring to the SEC's attention.

Smith seeks to justify this seeming oversight by claiming that there is no mechanism for informing the SEC of a new decision once briefing on a matter has closed. That is incorrect. Smith could have asked to file a supplemental brief before the matter was resolved. *See* 17 C.F.R. § 201.421(b) (procedure for supplemental briefing). Or he could have filed a motion for reconsideration after the SEC's final order, which did not address *Jarkesy*. *See id.* § 201.470(b) (procedure for reconsideration). Confirming as much, the SEC has in other cases granted motions seeking supplemental briefing on *Jarkesy*'s effect on FINRA adjudications when a party asked the SEC for permission to do so. *See, e.g.*, *Ricky Alan Mantei*, Exchange Act Release No. 101385, 2024 WL 4527340, at *1 (Oct. 18, 2024).

In short, we cannot excuse Smith's forfeiture of his Seventh Amendment argument because of an intervening change in law.

3. Lastly, Smith claims that raising the Seventh Amendment issue to the SEC would have been futile because the SEC had repeatedly rejected similar claims. To be sure, futility can be a valid justification for failing to exhaust constitutional arguments. *See Carr v. Saul*, 141 S. Ct. 1352, 1361 (2021) (citing *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S. 399, 405–06 (1988); *Mont. Nat'l Bank of Billings v. Yellowstone County*, 276 U.S. 499, 505 (1928)). But the futility exception the Supreme Court recognizes targets cases in which the "adjudicators . . . are powerless to grant the relief requested." *Id.* Our precedents are to the same end. We view the crucial inquiry as whether the agency can provide the relief requested if the argument succeeds, not whether it is likely to succeed. *See Jones Bros., Inc. v. Sec'y of Lab.*, 898 F.3d 669, 674 (6th

Cir. 2018) (citing *McCarthy v. Madigan*, 503 U.S. 140, 147–48 (1992)); *Island Creek*, 937 F.3d at 752–53; *Joseph Forrester*, 987 F.3d at 591 (citing *Peabody Coal Co. v. Greer*, 62 F.3d 801, 806 (6th Cir. 1995)).  This rule is designed to afford the agency the opportunity to reconsider its position in the first instance, and to promote efficient litigation.  *See Jones Bros.*, 898 F.3d at 673.

Smith misunderstands the futility excuse.  He treats it as a preordained result rule:  It would be futile to raise his constitutional challenge because everyone knows how the SEC would answer the issue.  In so doing, Smith confuses results for remedies.  The futility excuse, it bears explaining, concerns whether the agency can offer an appropriate remedy even if past agency decisions foreclose a successful result before the agency.  A party like Smith, it follows, is not excused from making an argument before an agency simply because the argument is destined to lose.

Properly framed, for Smith to prevail on his futility argument, he must show that the SEC did not have the power to remedy the purported Seventh Amendment violation he asserts.  He fails to do so.  Putting aside the fact that we have traditionally cabined our futility jurisprudence to facial challenges, *see id.* at 674–75, it remains the case that the SEC could have provided Smith a remedy.  Namely, the SEC was empowered to vacate the sanctions stemming from FINRA's adjudicative process, had the agency been persuaded to do so.  The SEC would then have had the choice to bring proceedings against Smith in federal court where he could request a jury.  *See* 15 U.S.C. § 78u(d).  Because the SEC could simply vacate the FINRA sanctions as an appropriate remedy, raising the Seventh Amendment argument before the SEC would not have been futile.

\*     \*     \*

To sum up, Smith cannot demonstrate a "reasonable ground" for his failure to exhaust his constitutional arguments at the agency level.  15 U.S.C. § 78y(c)(1).  The SEC has the competence to adjudicate Smith's Article III and Seventh Amendment argument.  Further, Smith's argument is not premised on a departure from existing law, so *Jarkesy* (which he never raised to the SEC) is not a reason to excuse his forfeiture.  And the SEC could have offered him

a remedy for a violation of these constitutional rights by pursuing enforcement efforts in federal court rather than in an administrative setting, defeating Smith's futility theory. That leaves us statutorily barred from reaching Smith's constitutional arguments.

C. All that said, had Smith raised his constitutional challenge before the SEC, he may well have been entitled to a jury trial in federal court. We employ a two-part test for determining when a defendant is due an Article III jury trial. *Jarkesy*, 144 S. Ct. at 2127. First, we ask whether the "action implicates the Seventh Amendment." *Id.* If so, then second, we determine whether the "public rights" doctrine applies, thereby exempting the case from Article III. *Id.* Within step one, there is a further two-part test for identifying whether the Seventh Amendment attaches. *Tull v. United States*, 481 U.S. 412, 417–18 (1987). To begin, we compare the action at issue to "18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Id.* at 417 (citing *Pernell v. Southall Realty*, 416 U.S. 363, 378 (1974); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962)). Then, we determine whether the remedy sought is legal or equitable. *Id.* at 417–18 (citing *Curtis v. Loether*, 415 U.S. 189, 196 (1974); *Ross v. Bernhard*, 396 U.S. 531, 542 (1970)).

With respect to the two-part test just described, we note that Smith, FINRA, and the SEC now all agree that FINRA merely acts as an aid to the SEC's ultimate adjudication. That makes the SEC the relevant adjudicatory body for applying the two-step framework. And for that reason, this case presents the same ultimate problem as did *Jarkesy*: The SEC is imposing sanctions against Smith (albeit on the recommendation of FINRA) without a jury trial before an Article III judge. *See Jarkesy*, 144 S. Ct. at 2126–27.

Against this backdrop, the analysis seemingly would be straightforward. With respect to the initial inquiry under step one—comparing the SEC's action at issue here to actions in English courts that predate "the merger of the courts of law and equity"—it is difficult to ignore the similarities between *Jarkesy* and today's case. *Tull*, 481 U.S. at 417 (citing *Pernell*, 416 U.S. at 378; *Dairy Queen*, 369 U.S. at 477). As in *Jarkesy*, the statutes, regulations, and rules that FINRA and the SEC sought to enforce are analogous to common law fraud. In fact, it bears noting that the SEC enforced § 10(b) of the Exchange Act and Rule 10(b)–5 against both Smith and Jarkesy. Both target "misrepresenting or concealing material facts," giving the regulatory

framework here "an enduring link" with "its common law 'ancestor.'" *Jarkesy*, 144 S. Ct. at 2130 (quoting *Foster v. Wilson*, 504 F.3d 1046, 1050 (9th Cir. 2007)).  So *Jarkesy*'s conclusion that these are legal actions that date back to the common law is directly controlling.  *See id.*

Further, as to the related inquiry—whether the remedy sought by the agency is legal or equitable—all indicators similarly point in favor of the Seventh Amendment's applicability to Smith's case.  Smith has a strong argument that the restitution order the SEC imposed against him was a legal, not equitable, sanction.  Although restitution is frequently "characterize[d] as a form of equitable relief," *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002), it has "existed remedially as legal, equitable, and sometimes both," Caprice L. Roberts, *The Restitution Revival and the Ghosts of Equity*, 68 Wash. & Lee L. Rev. 1027, 1043 (2011).  "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession."  *Great-West*, 534 U.S. at 214; *see also* Emily Sherwin & Samuel L. Bray, *Ames, Chafee, and Re on Remedies* 759–60 (2d ed. 2018) (discussing the difference between legal and equitable restitution).  When a victim cannot point to title to particular property but can show grounds for recovering some money, he has a legal remedy.  *Great-West*, 534 U.S. at 213.  By contrast, when money can be traced to particular funds in the defendant's possession, restitution is an equitable remedy (usually in the form of a constructive trust).  *Id.*; *see also* Sherwin & Bray, *supra*, at 760.

Here, FINRA's factual findings suggest that the money was quickly shuffled into the flow of CSSC-BD's income to keep the firm afloat.  As FINRA imposed joint and several liability on Smith and CSSC-BD for the restitution, that action suggests that FINRA and the SEC could not trace where the investors' money ultimately ended up.  Thus, it appears FINRA and the SEC are attempting to impose personal liability.  As such, the SEC's restitution order recognizes the investors' right to recover—but not from a specific source—making it a legal remedy. *Great-West*, 534 U.S. at 213.  Reinforcing this conclusion is FINRA's willingness to accept payment.  Although the restitution order here was tied to the amount Smith defrauded from investors, which does not go to "the culpability of the defendant and the need for deterrence," *Jarkesy*, 144 S. Ct. at 2130, the order requires Smith to pay FINRA if he cannot locate a victim.

Paying money to FINRA seemingly "does not 'restore the status quo' and," as a result, "can make no pretense of being equitable." *Id.* (quoting *Tull*, 481 U.S. at 422). Smith, it follows, has a firm basis for arguing that the remedy sought is legal in nature.

Moving on to the second step of the jury trial right analysis—whether the public rights exception applies—Smith continues to enjoy what would have been a strong claim. Return once more to *Jarkesy*. There, the Supreme Court held that the public rights doctrine did not apply to the SEC's enforcement of securities law when dealing with many of the same anti-fraud provisions enforced against Smith. *See id.* at 2136. And it is not difficult to see why. After all, at bottom, a statutory cause of action rooted in common law fraud that allows for legal remedies is a private right. *Id.* (quoting *Granfinanciera*, 492 U.S. at 56). The overlap between the cause of action in *Jarkesy* and this case makes it extremely difficult to distinguish *Jarkesy*. Both cases involve "a suit . . . made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,'" so Congress cannot employ the public rights doctrine to remove them from Article III courts. *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring in the judgment)).

The SEC's main response is that there is a long tradition of self-discipline in the securities industry, which exempts these proceedings from Article III. True, a historical tradition of assigning adjudication outside of Article III can be a basis for determining something is a public right. *See N. Pipeline*, 458 U.S. at 68 (plurality opinion) (citing *Ex parte Bakelite Corp.*, 279 U.S. 438, 458 (1929)). But the longstanding practice that the SEC points to here is one of consenting members regulating themselves. The leniency courts historically have shown to discipline in these organizations was based on the notion that "members [were] parties to a voluntary contract with the exchange." Westwood & Howard, *supra*, at 521. And here, that voluntary relationship is absent. Smith explicitly attempted to avoid becoming a member of FINRA and continues to contest FINRA's jurisdiction over him. And the SEC does not point to any historical tradition allowing SROs to discipline non-consenting non-members. For these reasons, the public rights doctrine does not undermine Smith's weighty assertion to a right to a jury trial before an Article III judge.

For today's purposes, however, these points are all for naught.  As Smith failed to make these arguments before the Commission, we cannot reach them, regardless of their strength.

\* \* \* \* \* \*

We deny Smith's petition for review.

---

**CONCURRENCE**

---

MURPHY, Circuit Judge, concurring.  I write to highlight an important "unconstitutional conditions" question lurking in the background of this case.  Suppose that two parties to a contract agree to arbitrate a federal claim.  By doing so, they forgo several procedural protections that they would otherwise enjoy under the U.S. Constitution.  To start, Article III grants the "judicial Power" to the Supreme Court and the inferior federal courts.  U.S. Const. art. III, § 1.  It thus bars Congress from stripping a person of an independent Article III judge in litigation over private rights.  *See Stern v. Marshall*, 564 U.S. 462, 483–84 (2011).  Likewise, the Due Process Clause prohibits the government from "depriv[ing]" a person "of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. V.  It thus ensures that the government cannot take a person's money except according to the "settled usages" of common-law courts. *McIntosh v. City of Madisonville*, 126 F.4th 1141, 1150 (6th Cir. 2025) (Murphy, J., concurring) (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 277 (1856)). Lastly, the Seventh Amendment compels the government to respect "the right of trial by jury" "[i]n Suits at common law[.]"  U.S. Const. amend. VII.  It thus guarantees that a jury will resolve the factual disputes that a legal claim presents.  *SEC v. Jarkesy*, 603 U.S. 109, 121–22 (2024). The hypothetical contracting parties have lost all these rights by agreeing to arbitrate because an arbitrator (not an Article III judge or a jury) will oversee the dispute and find the facts in a private venue (not a court of law).

Next suppose that one of the contracting parties has second thoughts about arbitrating the federal claim when a dispute materializes.  Can the party avoid arbitration on the ground that it violates these constitutional rights?  Not at all.  Parties may presumptively waive any right, including a constitutional right.  *See United States v. Mezzanatto*, 513 U.S. 196, 200–01 (1995). The validity of a waiver "depends on the nature of the right at issue."  *Kloosterman v. Metro. Hosp.*, 153 F.4th 501, 512 (6th Cir. 2025) (Murphy, J., concurring) (quoting *New York v. Hill*, 528 U.S. 110, 114 (2000)).  For constitutional waivers, the Supreme Court generally requires "an intentional relinquishment or abandonment of a known right or privilege."  *Brewer v. Williams*,

430 U.S. 387, 404 (1977) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). We have hinted at this standard in the arbitration context. *See Tillman v. Macy's Inc.*, 735 F.3d 453, 460–61 (6th Cir. 2013); *K.M.C. Co. v. Irving Tr. Co.*, 757 F.2d 752, 755–56 (6th Cir. 1985); *but see Cooper v. MRM Inv. Co.*, 367 F.3d 493, 506–08 (6th Cir. 2004). Yet other courts have followed a less demanding standard. *See IFC Credit Corp. v. United Bus. & Indus. Fed. Credit Union*, 512 F.3d 989, 993–94 (7th Cir. 2008); *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1372 (11th Cir. 2005). And the Supreme Court has suggested that general contract-law principles (including waiver principles) should apply to arbitration agreements. *See Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246, 251–55 (2017). Under any standard, though, a party who voluntarily enters an arbitration contract (and knowingly waives a jury trial) would likely be out of luck: the party must arbitrate the dispute because it consented to give up the Constitution's procedural protections for the claim at issue. *Cf. Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 674–76 (2015); *id.* at 702–03 (Roberts, C.J., dissenting); *id.* at 718–19 (Thomas, J., dissenting).

The SEC and FINRA argue that this case is just as easy as my hypothetical arbitration agreement. They point to the history of self-regulation in the securities industry dating back to the early 1790s. *See* Robert Sobel, *The Curbstone Brokers: The Origins of the American Stock Exchange* 10–14 (1970); Stuart Banner, *The Origin of the New York Stock Exchange, 1791–1860*, 27 J. Legal Stud. 113, 114–15 (1998). The founders of the early stock exchanges formed them as voluntary associations (or private clubs). *See* Richard W. Jennings, *Self-Regulation in the Securities Industry: The Role of the Securities and Exchange Commission*, 29 L. & Contemp. Probs. 663, 663 n.2, 667–69 (1964). Courts considering disputes between an exchange and its members concluded that the exchange's governing documents formed a "contract by which each member ha[d] consented to be bound[.]" *Belton v. Hatch*, 109 N.Y. 593, 596 (1888); *see White v. Brownell*, 4 Abb. Pr. (n.s.) 162, 192–94 (N.Y. C.P. 1868); Howard C. Westwood & Edward G. Howard, *Self-Government in the Securities Business*, 17 L. & Contemp. Probs. 518, 519–21 (1952). And those documents routinely required arbitration. *See* Jill Gross, *The Historical Basis of Securities Arbitration as an Investor Protection Mechanism*, 2016 J. Disp. Resol. 171, 174–76. Indeed, the New York Stock Exchange would enforce some futures contracts in private adjudications even though New York courts would find those contracts unenforceable in public

suits.    *See* William A. Birdthistle & M. Todd Henderson, *Becoming a Fifth Branch*, 99 Cornell L. Rev. 1, 14 (2013); Banner, *supra*, at 125.  In many ways, then, members who chose to join an exchange *voluntarily* agreed to arbitrate their disputes (and waive their constitutional protections) much like a business might agree to arbitrate a dispute today.

According to the SEC and FINRA, this "unbroken tradition" of self-regulation shows that FINRA can discipline its members (including by taking their money) using an internal process without an Article III judge or a jury.  Respondent's Br. 65 (quoting *Jarkesy*, 603 U.S. at 128); *see* FINRA Amicus Br. 47–48.  In other words, the SEC and FINRA argue that securities brokers accept FINRA's rules once those brokers decide to become FINRA members.  And these rules include a dispute-resolution process in which a hearing panel oversees a case and finds the facts. *See Mohlman v. FINRA*, 977 F.3d 556, 559 (6th Cir. 2020).  So the SEC and FINRA analogize today's FINRA members to yesterday's exchange members.  Just as the exchange members had to abide by their "contract" to follow the exchange's procedures, *Belton*, 109 N.Y. at 596–97, so too FINRA members allegedly must adhere to their contract to follow FINRA procedures.

But this analogy breaks down on inspection.  For most of the country's history until the 1930s, securities brokers had a *voluntary* choice over whether to join a securities exchange. They could apply to become an exchange member if they thought the advantages (such as access to trustworthy trading partners and price information) exceeded the disadvantages (such as the price of admission and, perhaps for some, the rules requiring arbitration).  *See* Banner, *supra*, at 120–24.  But brokers could also opt not to join an exchange and still operate a brokerage business.  In the early 1800s, for example, many brokers who did not join what would become the New York Stock Exchange would regularly "trade in restaurants or coffeehouses," among other places.  Sobel, *supra*, at 14.  Many of these individuals even traded securities in the "open air" on "the streets" and so became known as "curbstone brokers."  *Id.*  As a result, the exchanges' self-regulation did not reach "the vast majority of stock transactions" made "over-the-counter" by nonmember brokers.  Birdthistle & Henderson, *supra*, at 16; *see* Banner, *supra*, at 118.

Brokers do not have the same choice today.  Far from it.  Since 1983, Congress has barred Americans from engaging in the securities business unless they join a registered exchange

or securities association. *See* Pub. L. 98–38, § 3, 97 Stat. 205, 206–07 (1983) (amending 15 U.S.C. § 78o(b)(8)); *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1321 (D.C. Cir. 2024). To register, an exchange or association must agree to enforce its rules against its members using "a fair procedure" (presumably one that excludes a court with an Article III judge and jury). *See* 15 U.S.C. §§ 78f(b)(1), (6)–(7); 78o-3(b)(2), (7)–(8). After members exhaust an entity's internal processes, they may then appeal any punishment to the SEC for fresh review. *See id.* § 78s(d)(2), (e)(1). If the SEC affirms, they may (at long last) seek review in an Article III appellate court. *See id.* § 78y(a)(1). Even then, the court must defer to the SEC's factual findings. *Id.* § 78y(a)(4).

In short, unlike in earlier days, brokers today cannot buy and sell securities unless they become a member of a private body that regulates their conduct using procedures that do not include the Constitution's protections. Congress has thus put aspiring brokers to a choice: consent to forgo those constitutional protections or stay out of the brokerage business.

This government-mandated tradeoff implicates the "unconstitutional conditions" doctrine. *See Sheetz v. County of El Dorado*, 601 U.S. 267, 275 (2024); *Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 674–75 (1996). That doctrine limits the government's ability to take away constitutional rights by requiring a party to "voluntarily" give up those rights as a condition to receiving some other government benefit. *See Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 67 F.4th 816, 824 (6th Cir. 2023). For example, the government does not have unlimited discretion to compel landowners to hand over some of their land (in seeming violation of the Takings Clause) as a condition of receiving a government permit to build on it. *See id.* at 824–27. Nor does it have unlimited discretion to compel parties to express certain viewpoints (in seeming violation of the Free Speech Clause) as a condition to receive public grants or jobs. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 902–04 (2018); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AOSI*), 570 U.S. 205, 214–15 (2013).

Yet how should courts weed out unconstitutional conditions from constitutional ones? Although the Court has adopted different tests for different constitutional rights, the tests all start with a "generic" inquiry. *Knight*, 67 F.4th at 824. "If the Constitution allows the government to

directly compel a private party to" engage in the challenged conduct, "the government may indirectly compel that conduct as a condition on a benefit" that it provides. *Id.* (citing *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59–60 (2006)). Take patents that grant monopolies to private parties. Because individuals do not have a private right to patents, the government could directly compel those seeking them to litigate their claim in an administrative venue rather than a court. *See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 335–36 (2018). As a result, the government may also grant a patent on the *condition* that the holder accept this administrative venue in later disputes about the patent's validity. *See id.* at 341–42 & n.4.

Applying this "generic" test here, we must ask: Could Congress compel nonconsenting parties to litigate a dispute against them before a FINRA hearing panel (followed by the SEC's review) rather than a district court with an Article III judge and jury? *Knight*, 67 F.4th at 824. The answer likely depends on the type of claim and remedy at issue. For Article III, due-process, and jury-trial purposes, we would first have to ask if the adjudication would affect public rights (like a patent) or private rights (like a home). *Compare Oil States*, 584 U.S. at 335–36, *with McIntosh*, 126 F.4th at 1150–51 (Murphy, J., concurring). And for jury-trial purposes, we would also have to ask if the adjudication sought legal or equitable relief. *See Jarkesy*, 603 U.S. at 122–25. In this case, FINRA investigators pursued what looked like a common-law fraud claim, and they sought what looked like legal relief: a restitution award to be paid by the putative defendant from his own money. So I agree with Judge Readler that this case bears a striking resemblance to *Jarkesy*. Under that precedent, Congress likely could not force a *nonconsenting* party to litigate this claim outside an Article III court without a jury. *See id.* at 120–41.

I thus see only one possible way to distinguish the FINRA process in this case from the SEC process found unconstitutional in *Jarkesy*. We must ask whether Congress may indirectly require a party to *consent* to waive these constitutional rights as a condition of participating in a brokerage business (what regularly occurs under this FINRA regime) even if Congress could not impose that condition directly on nonconsenting defendants (what apparently occurred in the SEC regime at issue in *Jarkesy*). Apart from the generic first step, the Court has adopted

different unconstitutional-condition tests for different rights. *See Knight*, 67 F.4th at 824. In the takings context, for example, the Court has said that any requirement to give up property as a condition to obtain a building permit must have a "nexus" and "rough proportionality" to the land-use harms that the construction will cause. *See Sheetz*, 601 U.S. at 275–76. And in the speech context, the Court has said that Congress can impose speech limits inside a public program that it seeks to subsidize but cannot use that monetary subsidy to regulate speech outside that program. *See AOSI*, 570 U.S. at 214–15. As far as I am aware, though, the Court's cases have yet to develop any sort of test for the procedural rights at issue here. *Cf. Oil States*, 584 U.S. at 341–42 & n.4.

Perhaps the correct analysis should depend on the proper "baseline" from which to measure this condition. Richard A. Epstein, *Unconstitutional Conditions, State Power, and the Limits of Consent*, 102 Harv. L. Rev. 4, 9–10, 13 (1988). Consider an analogy. Many governments have long allowed a parole board—rather than a court or a jury—to find a parole violation that sends a convicted defendant back to prison. *See United States v. Haymond*, 588 U.S. 634, 651 (2019) (plurality opinion); *Morrissey v. Brewer*, 408 U.S. 471, 477–80 (1972). A parole-violation adjudication does not trigger the Constitution's normal procedural protections because a parolee's original conviction permitted the government to detain the parolee during the *entire* parole period. *See Morrissey*, 408 U.S. at 480; *see also Haymond*, 588 U.S. at 643, 651 (plurality opinion). And legislatures allowed parolees to serve part of their sentences outside prison "as an 'act of grace,' subject to revocation." *Haymond*, 588 U.S. at 643 (plurality opinion) (citation omitted). In other words, parolees received a benefit (early release) on the condition that they forgo the Constitution's usual protections for adjudicating allegations that they violated the terms of their release. Because parolees have only "conditional liberty," the government has "wide latitude" to put conditions on a departure from the background baseline: imprisonment. *Pa. Bd. of Prob. and Parole v. Scott*, 524 U.S. 357, 365 (1998) (quoting *Morrissey*, 408 U.S. at 480). By analogy, suppose that the proper baseline here were that *nobody* could operate a securities business without a similar "act of grace" by Congress. *Haymond*, 588 U.S. at 643 (plurality opinion) (citation omitted). Maybe Congress would then have "wide latitude" to grant the purported benefit (allowing brokerages) on the condition that brokers forgo the same procedural protections. *Scott*, 524 U.S. at 365.

But I doubt this is the proper baseline.  Indeed, this logic would permit Congress to eviscerate the Constitution's procedural protections.  Wouldn't it mean that Congress could wield its power over interstate commerce to impose mandatory arbitration on anyone who works (or who hires workers) as a condition of allowing them to do so?  One might instead start with the opposite baseline: that "at the common law, no man could be prohibited from working in any lawful trade[.]"  *Case of Tailors of Ipswich*, 77 Eng. Rep. 1218, 1219–20 (K.B. 1614); *see Calcutt v. FDIC*, 37 F.4th 293, 348 (6th Cir. 2022) (Murphy, J., dissenting) (quoting 2 Edward Coke, *Institutes of the Laws of England* 47 (1642)).  And we should recognize that Congress here has engaged in a form of "regulatory licensing" by first flipping that common-law baseline on its head (with "a background prohibition" of operating a brokerage business) and then imposing conditions on licenses to engage in the business.  Philip Hamburger, *Purchasing Submission* 201 (2021).  While governments today have broad leeway to regulate in the economic sphere, *see Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012), perhaps coercing parties to give up their constitutional rights in order to work can sometimes go a step too far.

In the end, I need not resolve these issues because the majority opinion correctly holds that the petitioner failed to exhaust his constitutional claims.  Still, I seek to reiterate two questions for future cases.  The first question concerns the SEC's and FINRA's reliance on the history of private self-regulation in the securities industry: Why should this history matter in a changed world in which Congress *forces* brokers to join a private association as a condition of operating a brokerage?  The second question concerns the unconstitutional-conditions doctrine: When (if ever) may Congress compel individuals to forgo their rights to an Article III judge and a jury as a condition of operating a business?  Leaving these questions for another day, I concur in the majority opinion.

---

**CONCURRENCE**

---

BLOOMEKATZ, Circuit Judge, concurring in the judgment. As the majority opinion articulates, Eric Smith raises two questions on appeal, one statutory and one constitutional. *First*, as to the statutory question, Smith contests that he fell within FINRA's regulatory jurisdiction. I agree with the majority opinion that, given the record and the statutory text, Smith was "associated with a [FINRA] member," and thus falls within FINRA's regulatory scope. 15 U.S.C. § 78c(a)(21); *id.* § 78o–3(b)(7). *Second*, as to the constitutional question, I also agree with the majority opinion that Smith did not exhaust this claim before the SEC, and that he lacked a "reasonable ground" for failing to do so. *Id.* § 78y(c)(1). Specifically, Smith's constitutional claim stems from the Supreme Court's decision in *SEC v. Jarkesy*, 603 U.S. 109 (2024), which was decided "*before* the SEC decided Smith's case." Maj. Op. at 12. I agree with the majority opinion that Smith could have raised *Jarkesy* with the SEC, *id.*, and that the SEC had authority to adjudicate his claim, *id.* at 9–11. Thus, there is no basis to excuse Smith's failure to exhaust.

I depart from the majority opinion because of its dicta opining on the merits of Smith's constitutional claim. The Securities Act directs that no "objection to an order or rule" of the SEC "may be considered by the court" unless it was exhausted before the agency "or there was reasonable ground for failure to do so." 15 U.S.C. § 78y(c)(1). *See also Mohlman v. Fin. Indus. Regul. Auth.*, 977 F.3d 556, 560–61 (6th Cir. 2020). Yet the majority opinion spends many pages considering Smith's constitutional claim and argues in no uncertain terms that the SEC's adjudicatory process "may well" be unconstitutional, only to lament at the end of its analysis that its "points are all for naught." Maj. Op. at 14, 17. To be sure, we sometimes examine legal issues not squarely presented in a case. But we typically do so by posing questions, highlighting issues that the Supreme Court may want to address, or writing separately. *See, e.g., Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 749 (6th Cir. 2019); *United States v. Morton*, 123 F.4th 492, 497 n.2 (6th Cir. 2024); *Niblock v. Univ. of Kentucky*, 165 F.4th 460, 473 (6th Cir. 2026) (Sutton, C.J., and Murphy, J., concurring). That is not what the majority opinion did here.

Because I would not have addressed the merits of the unexhausted constitutional claim, I respectfully concur in the judgment only.